PLANNED PARENTHOOD LEAGUE OF
MASSACHUSETTS et al., Appellants,

v.

Francis X. BELLOTTI et al., Appellees.

No. 80–1580.

United States Court of Appeals,
First Circuit.

Argued Oct. 6, 1980.

Decided Feb. 9, 1981.

Rehearing Denied April 15, 1981.

John H. Henn, Boston, Mass., with whom Sandra L. Lynch, and Foley, Hoag & Eliot, Boston, Mass., were on brief, for appellants.

Stephen S. Ostrach, Asst. Atty. Gen., Boston, Mass., with whom Francis X. Bellotti, Atty. Gen., Carl Valvo and Donald K. Stern, Asst. Attys. Gen., Government Bureau, Boston, Mass., were on brief, for appellees.

Before COFFIN, Chief Judge CAMPBELL and BOWNES, Circuit Judges.

COFFIN, Chief Judge.

This appeal puts in issue the constitutionality of a Massachusetts statute establishing three prerequisites to the performance of abortions: first, that a minor obtain parental or judicial approval prior to having an abortion; second, that any woman seeking an abortion sign a consent form prescribed by the state containing specified information about abortion; and third, that a woman wait twenty-four hours after signing that form before having an abortion.

*Parties and Proceedings*

Plaintiffs-appellants in this action are the Planned Parenthood League of Massachusetts, a non-profit foundation which provides abortion counselling and referral services; Crittenton Hastings House, a medical clinic which provides abortions and abortion-related services; Phillip Stubblefield, M.D., a physician whose practice includes the performance of abortions; and Jane Doe, at the commencement of the action an unmarried pregnant minor who sought to terminate her pregnancy without parental or judicial approval (hereafter jointly "appellants"). All appear both on their own behalf and on behalf of the separate classes that the district court certified them to represent. Defendants-appellees are Francis X. Bellotti, Attorney General of the Commonwealth of Massachusetts; Arthur Frechette, M.D., Commissioner of Public Health of the Commonwealth; and Newman Flanagan, District Attorney of Suffolk County, named as a representative of all District Attorneys in the Commonwealth (hereby jointly "appellees" or "the state"). All are charged with some aspect of enforcement or implementation of the challenged statute.

Appellants initially sought preliminary and permanent injunctive relief against enforcement of the statute at issue shortly before it was to take effect. The district court held a three-day hearing; it heard testimony from several witnesses, received a partial stipulation, and admitted into evidence several lengthy affidavits and substantial portions of the record before the Supreme Court in *Bellotti v. Baird*, 443 U.S. 622, 99 S.Ct. 3035, 61 L.Ed.2d 797 (1979). The district court, 499 F.Supp. 215, denied the motion for a preliminary injunction in its entirety, holding that appellants had failed to show a probability of success on the merits as to any provision of the statute. The court also denied appellants' motion for a stay of enforcement of the stat-

ute pending appeal, but did grant a 10-day stay of enforcement to allow relief to be sought in this court. We consolidated the motion for a stay with the appeal of the denial of the preliminary injunction, granted expedited review, and continued the district court's stay until further order.

*The Statute*

A relatively brief amendment of only one section of the comprehensive statutory scheme regulating abortions in Massachusetts, the act before us nonetheless contains significant provisions of two kinds. *See* Mass.Gen.Laws ch. 112, § 12S, as amended by 1980 Mass.Acts ch. 240 ("the statute").[1] The first, applicable only to unmarried minors, requires that they obtain one of two prescribed forms of approval prior to an abortion: the consent of both parents, or of the parent having custody if the parents are divorced, or of one parent if the other is unavailable within a reasonable time, or of a guardian if both parents are unavailable; or an authorization from a judge of the state's Superior Court, which is to be given if the judge decides either that the woman seeking it is mature and capable of giving informed consent or that having an abortion would be in her best interest. The statute also sets forth certain procedures to be followed in connection with the judicial alternative, including provisions for proceeding pro se, for appointment of a guardian *ad litem*, for a right to court-appointed counsel, for confidentiality of proceedings, for expedited proceedings, and for the maintenance of a record including written findings of fact and conclusions of law.[2]

The second set of requirements imposed by the act, applicable to all women seeking abortions in Massachusetts, establishes an "informed consent" prerequisite to the performance of abortions, comprising two related but distinct elements. One requires that a woman's written consent to an abortion be obtained on a form that the commissioner of public health is directed to promulgate. The form is to include, in language understandable to lay persons, a discussion of the procedure to be used, possible complications, and the availability of alternatives to abortion; a statement that a refusal to have an abortion does not constitute grounds for the denial of public assistance; and a description of the stage of development of the fetus. The second prong of the informed consent scheme requires that a woman sign the prescribed form at least twenty-four hours in advance of having an abortion, except in an emergency requiring immediate action. The physician is directed to retain the signed form for seven years, during which time it is not to be released to anyone except with the woman's consent, by judicial order, or to those whose approval is required under the statute.

We note also at this juncture that we have before us in addition to the text of the statute two sets of implementing documents issued pursuant to it: the interim regulations of the Superior Court setting forth in greater detail the procedures to be followed in processing applications for judicial approval,[3] and the forms prepared by the commissioner of public health to be used in obtaining a woman's consent.[4] We join with the parties and the district court in taking these documents as authoritative interpretations of key provisions of the act,

1. The act is applicable to abortions performed in any trimester of pregnancy. The full Massachusetts abortion regulation scheme is codified at Mass.Gen.Laws ch. 112, §§ 12K–12U. The text of the act before us is set forth as Appendix 1.

2. The act is in form a criminal statute directed at physicians, who may be sentenced to fines up to $2000 upon conviction. *See* Mass.Gen. Laws ch. 112, § 12T.

3. The Administrative Justice of the Superior Court Department has promulgated Standing Order No. 12–80 (August 26, 1980), establishing uniform procedures for such proceedings and providing a simplified form petition to be used in them. The text of the Order, together with the form, is set forth as Appendix 2.

4. The commissioner of public health has issued a proposed consent form and three informational forms, one applicable to each of the three trimesters of pregnancy. The consent form and the informational form applicable to first trimester abortions are set forth as Appendix 3.

and view them as integral parts of the regulatory scheme before us. Accordingly, we would consider the statute to present potentially different questions of law to the extent that these interpretations were not in fact adhered to.

*The Preliminary Injunction Standard*

At the outset we take note of the burden that appellants must meet in order to gain a preliminary injunction, the elements of which have recently been well summarized as follows:

"In the First Circuit, a plaintiff must satisfy four criteria in order to be entitled to a preliminary injunction. The Court must find: (1) that plaintiff will suffer irreparable injury if the injunction is not granted; (2) that such injury outweighs any harm which granting injunctive relief would inflict on the defendant; (3) that plaintiff has exhibited a likelihood of success on the merits; and (4) that the public interest will not be adversely affected by the granting of the injunction." *Women's Community Health Ctr., Inc. v. Cohen*, 477 F.Supp. 542, 544 (D.Me.1979) (citations omitted).

We also note the standard of review applicable to an appeal from a denial of a preliminary injunction, borrowing from another court we believe to have stated the matter well:

"The decision to grant or deny a preliminary injunction is a matter for the discretion of the district court and is reversible, of course, only for an abuse of discretion. It is also well-settled, however, that the application of an improper legal standard in determining the likelihood of success on the merits is never within the district court's discretion. Similarly, misapplication of the law to particular facts is an abuse of discretion. In either of these circumstances, the denial of the preliminary injunction should be reversed and the injunction entered if necessary to protect the rights of the parties." *Charles v. Carey*, 627 F.2d 772, 776 (7th Cir. 1980) (citations omitted).

With these principles in mind, we turn to the merits of the case before us. Each of the challenged provisions presents difficult questions of law and policy, calling for a careful interpretation of recent Supreme Court cases together with a sensitive weighing of the important constitutional and public policy concerns implicated in the questions left unresolved by those cases. We emphasize that because we hear this matter on appeal from a denial of a preliminary injunction, all of our "conclusions" and "holdings" as to the merits of the various issues presented are to be understood as statements as to probable outcomes. We eliminate repeated reference to this fact at each relevant juncture of this lengthy opinion for purposes of brevity and simplicity.

## I. PARENTAL/JUDICIAL APPROVAL REQUIREMENTS

Our determination of the constitutionality of the parental/judicial approval prerequisite to a minor's receiving an abortion must begin with a review of a trio of recent Supreme Court decisions very much on point: *Planned Parenthood of Central Mo. v. Danforth*, 428 U.S. 52, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976); *Bellotti v. Baird*, 428 U.S. 132, 96 S.Ct. 2857, 49 L.Ed.2d 844 (1976) (*Bellotti I*); and, most importantly, *Bellotti v. Baird*, 443 U.S. 622, 99 S.Ct. 3035, 61 L.Ed.2d 797 (1979) (*Bellotti II*). In *Danforth* the Court *inter alia* held invalid a provision of a Missouri statute that required an unmarried minor seeking an abortion to obtain in advance the consent of one parent or a guardian, unless a physician certified the abortion as "necessary to preserve the life of the mother." *See* 428 U.S. at 72–75, 96 S.Ct. at 2842–2844. In *Bellotti I* the Court was presented with the predecessor to the statute presently before us, and remanded the case to the district court with instructions to certify questions of statutory interpretation to the Massachusetts Supreme Judicial Court. *See* 428 U.S. at 146–52, 96 S.Ct. at 2865–2868. In *Bellotti II* the Court faced the same statute after certification, construction by the state court, and another declaration of unconstitutionality by the three-judge district court. *See* 443 U.S. at 625–33, 99 S.Ct. at 3039–

3043. Because the Court's decision in *Bellotti II* bears so closely on our decision here, we think it appropriate to recount its analysis of the statute at issue there in some detail.

An unmarried minor woman could receive an abortion under that act only by obtaining either parental approval or authorization from a judge of the Superior Court. The court, which was to consider exclusively the minor's best interest, was to authorize an abortion if it found that an abortion would serve that interest; the court could withhold authorization if it determined that an abortion would not so serve, even if it also found that the minor had made or was capable of making an informed and reasonable decision to have an abortion. A minor could not pursue this judicial alternative, however, without first seeking both parents' approval, or the approval of one parent if the other parent was unavailable, unless the need for an abortion constituted an emergency; parental notification of judicial proceedings was required in all cases except where the parents were unavailable. *See* 443 U.S. at 625–31, 99 S.Ct. at 3039–3042.[5]

The Court found two constitutionally fatal flaws in this statutory scheme:

> "First, it permits judicial authorization for an abortion to be withheld from a minor who is found by the superior court to be mature and fully competent to make this decision independently. Second, it requires parental consultation or notification in every instance, without affording the pregnant minor an opportunity to receive an independent judicial determination that she is mature enough to consent or that an abortion would be in her best interests." *Id.* at 651, 99 S.Ct. at 3052.

The Court asserted, however, that the statute "satisfies constitutional standards in large part", *id.*, and that its safeguards "avoid much of what was objectionable in the statute successfully challenged in *Danforth*", *id.* at 645, 99 S.Ct. at 3049. In addition, the Court characterized its discussion of possible alternative approval procedures as an "attempt to provide some guidance as to how a state constitutionally may provide for adult involvement ... in the abortion decisions of minors". *Id.* at 651–52 n. 32, 99 S.Ct. at 3052–3053 n. 32. A key passage of that guidance is critically relevant here:

> "We conclude, therefore, that under state regulation such as that undertaken by Massachusetts, every minor must have the opportunity—if she so desires—to go directly to a court without first consulting or notifying her parents. If she satisfies the court that she is mature and well-enough informed to make intelligently the abortion decision on her own, the court must authorize her to act without parental consultation or consent. If she fails to satisfy the court that she is competent to make this decision independently, she must be permitted to show that an abortion nevertheless would be in her best interests. If the court is persuaded that it is, the court must authorize the abortion. If, however, the court is not persuaded by the minor that she is mature or that the abortion would be in her best interest, it may decline to sanction the operation." *Id.* at 647–48, 99 S.Ct. at 3050–3051.[6]

We conclude in turn that these principles essentially foreclose a due process challenge to the facial constitutionality of the approval scheme now before us. For the amended approval requirements enacted by the Mas-

---

**5.** The statute was similar or identical to the one before us in most other respects, including its provisions as to absent or deceased parents and as to the need to process judicial applications expeditiously and confidentially.

**6.** Although appellants properly characterize this guidance as dictum, we think it clear that it represents the Court's considered view and is to be accorded great weight. The opinion quot-

ed was a plurality opinion representing the views of four Justices; since Justice White dissented on the ground that he found the statute then before the Court to be constitutional, we think it plain that he would find a less restrictive version constitutional as well. *See Bellotti v. Baird, supra,* 443 U.S. at 656–57, 99 S.Ct. at 3055 (White, J., dissenting).

sachusetts legislature subsequent to *Bellotti II* were clearly designed to eliminate the two provisions found objectionable there and to track its "guidance" rather closely, and we believe they do so successfully.

Indeed, appellants appear to recognize the dispositive force of this guidance, for they direct their principal challenges not to the statute's facial impact on substantive due process rights, which would otherwise constitute their natural foundation, but rather to corollary burdens assertedly imposed by its implementation. These challenges take two forms: first, that the requirements even if not necessarily unconstitutional as written would nonetheless be so burdensome in practice as to offend due process; and second, that in the context of other Massachusetts regulations the requirements would deny unmarried minors seeking abortions equal protection of the laws in several respects.

As to the first, appellants are correct in asserting that a requirement unduly burdensome in operation will be struck down even if not clearly invalid on its face. But we are convinced that no sufficient showing of such an effect has been made here. Appellants suggest that undue burdens will result from the state's choice of the Superior Court as the exclusive forum in which a minor may obtain judicial consent, arguing that the existence of a $50 filing fee in that court, the limited times during which it is in session, and the lack of easily utilized standard forms for such actions will in fact bar many minors from access to judicial consent. We agree that the exclusive jurisdiction of the Superior Court could be troubling, and we recognize that such obstacles might in some instances rise to the level of impermissible burdens. But the availability

of an indigency waiver[7] significantly reduces the possible burdensomeness of the filing fee, and the Superior Court's provision for both immediate access to the court at all times and a simple form for such actions has rendered the other possible obstacles far less substantial. In light of these ameliorative factors, and on a record undeveloped as to the actual operation of the judicial approval procedure, we are not prepared to hold that its effects will be so burdensome as to deny due process of law to minors seeking to use it.[8]

Appellants' second challenge to the approval scheme rests on the claim that, in the context of other Massachusetts laws, it denies minors seeking abortions equal protection of the laws in several respects. Appellees seek to blunt this argument at the outset, contending that because the Supreme Court was attempting in *Bellotti II* to outline a constitutionally permissible approval procedure its "guidance" settles equal protection as well as due process inquiries. Appellants counter by noting first that the Court in *Bellotti II* expressly reserved equal protection questions, *see* 443 U.S. at 650 n. 30, 99 S.Ct. at 3052 n. 30, and second that its failure to consider such questions was compelled by the nature of its guidance—a hypothetical discussion lacking any overall statutory framework that could give content to an equal protection analysis. In response, appellees contend that an equal protection challenge cannot survive the rejection of due process claims regardless of *Bellotti II's* implications because in the abortion context there is no practical difference between due process and equal protection analyses.

We agree with the appellants on these threshold questions. While it is true

---

7. *See* 1980 Mass.Acts ch. 539, §§ 5–9.

8. We note briefly that we attach some significance to the manner in which an appeal may be taken from the judgment of the Superior Court. The state has represented that an expedited confidential appeal would be available to a minor should the court rule against her, and we assume such an appeal to be available; we would consider a much different question to be presented were it not to be. *Cf. Margaret S. v.*

*Edwards,* 488 F.Supp. 181, 203 (E.D.La.1980) ("the necessity for [expedited appeal] is obvious in an abortion situation"). Conversely, neither the statute nor the Superior Court's procedural directive provides for intervention in the proceedings, or for appeal of a judgment authorizing an abortion, by the state, the parents of the minor, or any other party; again we would consider such provisions to present quite different questions.

that in many cases the due process and equal protection clauses yield the same results, *see* Tribe, American Constitutional Law 992 (1978) (citing cases), it nonetheless remains settled that a statute that does not itself impinge on a protected substantive right will be struck down if it employs an impermissible classification. *See Harris v. McRae,* 448 U.S. 297, 321–325, 100 S.Ct. 2671, 2690–2692, 65 L.Ed.2d 784 (1980); *Zablocki v. Redhail,* 434 U.S. 374, 391, 98 S.Ct. 673, 683–684, 54 L.Ed.2d 618 (1978) (Stewart, J., concurring). It necessarily follows that equal protection claims can be considered only in the context of particular classification schemes, and that the Supreme Court's reservation of such questions in *Bellotti II* was indeed compelled by the posture of its discussion.

In turning to the equal protection challenge to the statute presented here, the first question we must face is that of "what burden of justification the classifications created thereby must meet." *Memorial Hospital v. Maricopa County,* 415 U.S. 250, 253, 94 S.Ct. 1076, 1079, 39 L.Ed.2d 306 (1974). We address this question "by looking to the nature of the classification and the individual interest affected." *Id.* This determination turns first on whether the distinctions created by the statute utilize any suspect classification. *See Harris v. McRae supra,* 448 U.S. at 321–325, 100 S.Ct. at 2690–2692, *Maher v. Roe,* 432 U.S. 464, 470, 97 S.Ct. 2376, 2380–2381, 53 L.Ed.2d 484 (1977); *San Antonio School District v. Rodriguez,* 411 U.S. 1, 17, 93 S.Ct. 1278, 1288, 36 L.Ed.2d 16 (1973). It is undisputed in this case that none of the several distinctions involved does so; we therefore have no occasion on that ground to apply strict scrutiny, which would require a compelling state interest to justify the statutory distinctions.

Appellants point out, however, that the statutory distinctions involved here, partic-ularly that between abortion and childbirth and that between abortion and other medical procedures, interfere with the exercise of a fundamental right. On that ground they argue that strict scrutiny is appropriate, and that the distinctions may be justified only by a compelling state interest. The Supreme Court has on occasion stated that strict scrutiny is applicable when a classification "impermissibly interferes with the exercise of a fundamental right." *Massachusetts Board of Retirement v. Murgia,* 427 U.S. 307, 312 & n. 3, 96 S.Ct. 2562, 2566 & n. 3, 49 L.Ed.2d 520 (1976); *see also Zablocki v. Redhail,* 434 U.S. 374, 383, 98 S.Ct. 673, 679, 54 L.Ed.2d 618 (1977). But as we have indicated in the context of our discussion of appellants' due process claim, we think *Bellotti II* forecloses the assertion that this statute impermissibly burdens the right of a minor to an abortion: five members of the Court have accepted the view that the state's interest in protecting minors from immature decisions regarding abortion justifies the burden imposed by this statute, and we consider ourselves bound by that view. *See* note 6, *supra.* We therefore evaluate the distinctions created by this statute according to the test of whether they are rationally related to legitimate state interests.[9]

First, appellants challenge the distinctions drawn between minors choosing abortion and minors choosing childbirth.[10] This distinction is perhaps the one most fundamental to the statutory scheme, and an equal protection objection to it substantially restates the basic due process claim that the requirement unduly burdens the exercise of a fundamental right. The views expressed in *Bellotti II* implicitly assume that a state may rationally conclude that the decision to have an abortion poses risks to the physical, mental, or emotional well-being of a minor which are greater than the risks posed by the decision to bear a child. Accepting this implicit conclusion, as we must, we hold

---

9. It is clear that some distinctions between abortion and other procedures are unconstitutional under this standard. *See, e. g., Doe v. Bolton,* 410 U.S. 179, 192–200, 93 S.Ct. 739, 747–751, 35 L.Ed.2d 201 (1971).

10. Appellants press this challenge separately as to mature and immature minors. We regard the issue presented as essentially the same for each group and consider the two together.

that the distinction between abortion and childbirth created by this statute is rationally related to the legitimate state interest in protecting the well-being of minors.

Appellants' second equal protection challenge centers on the distinction drawn between minors seeking abortion and minors seeking other forms of medical care.[11] Having accepted as rational the legislature's implicit conclusion that abortion may pose risks to the well-being of a minor greater than those posed by childbirth, we think little more need be said on the issue; it follows *a fortiori* that abortion may be rationally thought to pose risks, albeit not specifically medical ones, greater than the risks posed by other medical procedures. Moreover, the Court in *Bellotti II* explicitly accepted the rationality of this distinction by sustaining the requirements that both parents consent to a minor's abortion decision while only one parent's consent was required for all other procedures. *Bellotti II, supra*, at 648–49, 99 S.Ct. at 3050–3051. While the court did not discuss the equal protection clause in this context, its holding seems strongly if not necessarily to imply that that clause would not serve to invalidate such a provision. Noting that the burden imposed by this requirement was minimized by the availability of the judicial consent alternative, the Court relied for its holding on the simple assertion that "[t]he abortion decision has implications far broader than those associated with most other kinds of medical treatment." *Id.* at 649, 99 S.Ct. at 3050–3051. *See also Danforth, supra* (upholding two requirements applicable to abortions but to virtually no other procedure, one requiring a patient's prior written consent, 428 U.S. at 66–67, 96 S.Ct. at 2839–2840, and the other directing maintenance of specified records, *id.* at 80–81, 96 S.Ct. at 2846–2847); *Bellotti I, supra*, 428 U.S. 149–50, 96 S.Ct. 2867–2868 (citing *Danforth* for the proposition that "not all distinction between abortion and other procedures is forbidden .... The constitutionality of such

a distinction will depend upon its degree and the justification for it"). With these precedents in mind, we hold that the distinction drawn by this statute between abortion and other medical procedures sought by minors is rationally related to the state's legitimate interest in protecting the well-being of minors, and does not deny minors choosing abortion the equal protection of the laws.

Appellants additionally argue that the approval requirement impermissibly discriminates in several other ways as well: against unmarried as opposed to married minors; against mature minors as opposed to adults; and against abortion providers as opposed to providers of other medical services. We note that, in a case in which strict scrutiny was applied, the first two of these distinctions have been held not to be necessary to effectuate any compelling state interest. *See Wynn v. Carey*, 599 F.2d 193, 196 (7th Cir. 1979). Again emphasizing the limited standard of review that we apply to these distinctions, we conclude that they too are justified by the legitimate state interest in protecting minors and that, while they may not be absolutely necessary to that interest, we cannot say that they bear no rational relationship to it. We therefore hold that these distinctions do not violate the equal protection clause.

## II. INFORMED CONSENT REQUIREMENTS

The informed consent provisions of the act comprise two distinct requirements: first that a woman sign a state-prescribed form imparting certain information about abortions ("the DPH form"), and second that she wait twenty-four hours after signing that form before having an abortion. Appellants challenge each of these requirements on both due process and equal protection grounds. We consider first the waiting period and then the form.

---

**11.** This difference results from the fact that certain classes of minors, specifically including pregnant minors, are given the right to decide upon other forms of medical care without pa-

rental approval under Massachusetts' "mature minor" law. *See* Mass.Gen.Laws ch. 112, § 12F; *Baird v. Attorney General*, 371 Mass. 741, 360 N.E.2d 288 (1977).

## A. The Waiting Period

■ Waiting period requirements have proven a popular form of abortion regulation in recent years, and while the Supreme Court has yet to pass on their validity they have generated a proliferation of lower court decisions. These courts have divided, with a majority holding such a requirement unconstitutional. *See, e. g., Charles v. Carey, supra,* 627 F.2d at 785–86 (24-hour waiting period); *Margaret S. v. Edwards,* 488 F.Supp. 181, 212–13 (E.D.La.1980) (24 hours); *Leigh v. Olson,* 497 F.Supp. 1340 (D.N.D.1980) (48 hours); *Women's Services, P.C. v. Thone,* 483 F.Supp. 1022 (D.Neb. 1979) *aff'd,* 636 F.2d 206 (8th Cir. 1980) (48 hours); *Planned Parenthood Ass'n v. Ashcroft,* 483 F.Supp. 679, 696 (W.D.Mo.1980) (48 hours); *Women's Community Health Center, Inc. v. Cohen, supra,* 477 F.Supp. at 550–51 (48 hours); *Wolfe v. Stumbo,* Civ.No. C80–0285L(A) (W.D.Ky. Dec. 3, 1980) (24 hours). *But see Wolfe v. Schroesing,* 541 F.2d 523, 526 (6th Cir. 1976) (24 hours); *Akron Center for Reproductive Health v. City of Akron,* 479 F.Supp. 1172, 1204–05 (N.D.Ohio 1979) (24 hours).

We consider first the question of burden, looking to whether this regulation burdens a woman's ability to make a decision regarding abortion free from governmental interference. Because it temporarily forecloses the availability of an abortion altogether, the requirement constitutes a "state-created obstacle" and "direct state interference", *Maher v. Roe, supra,* 432 U.S. at 473–75, 97 S.Ct. at 2382–2383, with a woman's abortion decision. *See Women's Community Health Ctr., Inc. v. Cohen, supra,* 477 F.Supp. at 550 ("[p]erhaps most significantly, a woman who has chosen to have an abortion would be *prevented,* at least temporarily, from effectuating that decision.") (emphasis in original); *Women's Services, P.C. v. Thone, supra,* 483 F.Supp. at 1043 ("Absent an emergency situation, the informed-consent and waiting-period requirement would stand between the woman's desiring an abortion and obtaining one. This is a *direct obstacle* to abortion . . . .") (emphasis in original). In addition, this bar operates even during the first trimester of pregnancy, during which a woman's right to have an abortion, while not absolute, is at its strongest. *See Roe v. Wade,* 410 U.S. 113, 163, 93 S.Ct. 705 at 731–732, 35 L.Ed.2d 147.

We need not consider whether an extremely brief bar alone might be a *de minimis* burden, for the mandatory waiting period here imposes substantial ancillary burdens on a woman's right to have an abortion. First, as the district court found, delay "increases the risk in the medical procedures." Other courts have consistently recognized the significance of this effect. *See Women's Community Health Ctr., Inc. v. Cohen, supra,* 477 F.Supp. at 551 ("The record discloses that any delay increases the risk to the woman's health; the risk of major complications increases 20 to 30 percent each week of delay, and the risk of death increases about 50 percent each week."); *Planned Parenthood Ass'n v. Ashcroft, supra,* 483 F.Supp. at 696 ("The experts seem to be in accord that the length of gestation at the time of abortion is directly related to the risk presented by the procedure to the woman's life and health, the risk increasing the later an abortion is performed. The court is convinced that the forty-eight hour delay imposed by the statute would have, in the words of plaintiffs' expert, a 'significant health impact' on a woman seeking an abortion.")

In addition, we note that a combination of a woman's schedule and the schedule of her abortion clinic may often serve to produce "a substantially longer delay" than 24 hours. *Charles v. Carey, supra,* 627 F.2d at 785; *Women's Community Health Ctr., Inc. v. Cohen, supra,* 477 F.Supp. at 550–51 (48-hour waiting period "will delay some abortions longer than two days, perhaps as long as a week"). This effect would exacerbate each of the obstacles above—both the absolute bar and the ancillary burdens—and render them even greater impediments. Moreover, this delay may in at least a few cases result in a transition from the first to the second trimester of pregnancy, which would trigger a Massachusetts requirement that second-trimester abortions be per-

formed in a hospital and which could sharply increase the cost or reduce the availability of an abortion (and which, ironically, might also require a woman to receive a second-trimester information form and wait another 24 hours). *See Women's Community Health Ctr., Inc. v. Cohen, supra,* 477 F.Supp. at 551.

Finally, the fact that the form must be signed at least 24 hours prior to an abortion necessitates that a woman undertake at least two separate trips to obtain an abortion. Although the state has indicated that copies of the form will be distributed widely, obtaining one will necessitate a separate trip to some facility in any event, and it seems likely that many women will obtain the form only when actually seeking an abortion. This effect necessarily imposes burdens in terms of time, money, travel and work schedules; for many women, particularly the poor, the rural, and those with pressing obligations, these burdens will be substantial. *See Women's Community Health Ctr., Inc. v. Cohen, supra,* 477 F.Supp. at 550–51; *Planned Parenthood Ass'n v. Ashcroft, supra,* 483 F.Supp. at 696.

We therefore conclude that this requirement constitutes a substantial state-created burden on a woman's fundamental right. Unlike the laws at issue in *Harris* and *Maher,* the statute before us is not neutral with respect to those burdens; to the contrary, it is their direct source. *Cf. Harris v. McRae, supra,* 448 U.S. at 313–318, 100 S.Ct. at 2686–2688 ("The Hyde Amendment, like the Connecticut welfare regulation at issue in *Maher,* places no governmental obstacle in the path of a woman who chooses to terminate her pregnancy.") As a result, the state must demonstrate that the restrictions are necessary to a compelling state interest if they are to withstand constitutional scruti-

ny. The state has advanced a single justification to meet that burden—that by providing a period of time in which women may reflect on the information in the form, free from the putative pressures of an abortion clinic, the waiting period promotes truly informed decisions. We find this rationale insufficient.

First, we note that it is unclear that the enforced delay will in fact serve the state's asserted interest at all. The evidence before the district court established without contradiction, and other courts have consistently found, that virtually all women have given considerable thought to their decision to have an abortion long before they actually seek one. *See Women's Community Health Ctr., Inc. v. Cohen, supra,* 477 F.Supp. at 551; *Planned Parenthood Ass'n v. Ashcroft, supra,* 483 F.Supp. at 696; *Wolfe v. Stumbo, supra,* slip op. at 7. Thus, contrary to the state's assertion, the period following the counselling given at the time of an abortion need not itself provide an independent opportunity for reflection in order for truly informed consent to be obtained. Because the requirement provides not for the imparting of any information but for a period of reflection upon information already obtained, it serves the state's interest in informed consent, if at all, only indirectly.[12] Initially, its validity must rest on an assumption that women seeking abortions would benefit from taking this time to consider their decision. But women who wish to give second thought to their decision to seek an abortion are free to take any time they want. Thus, the only women on whom this requirement might have an impact are those who would not wait 24 hours in the absence of this statute —who, that is, do not want the delay they are required to endure.[13] Ultimately, then,

---

**12.** The doctrine of informed consent has been the subject of significant litigation and commentary in recent years. Because virtually all of this attention has focussed on its role as an element of a patient's cause of action against a physician, little of it is of direct applicability here. For an excellent recent review of the history, policy, literature, and current controversies of the doctrine, *see Woolley v. Hender-*

son, 418 A.2d 1123, 1128–32 (Me.1980); *see generally* J. Ludlam, *Informed Consent* (1978).

**13.** The evidence before the district court indicated that very few women were likely to change their decisions as a result of the waiting period. This indication accords with the findings made as to this question by other district courts to consider it. *See, e. g., Women's Community Health Ctr., Inc. v. Cohen, supra,* 477

the state's asserted justification necessarily rests on the position that at least some women who do not want a delay when they first seek an abortion will nevertheless make better informed decisions after being required to wait 24 hours. Indeed, given the absence of any material new information, the true assumption here is not that such women will be better "informed" in a factual sense but rather that they will make decisions that will be, or that they themselves will later come to view as, "better" in a judgmental sense.

We recognize that this position is not wholly irrational. Many women are no doubt ambivalent about abortions, as people often are about significant decisions, and the idea that calm reflection and a day of thought may reduce impulsiveness and promote optimal decisions is not a new one in our society. But the mandatory imposition of a waiting period at such a stressful time has not been shown to be conducive to calm reflection, nor would it necessarily be so. In addition, in light of the extensive consideration that most women have given the abortion decision in advance, and in the absence of any factors sufficient to invoke the state's *parens patriae* power, we cannot say that truly informed consent is impossible or even unlikely without the mandatory delay. Nor do we find the waiting period requirement to be narrowly tailored to serve the interest at stake. No provision or exception is made, for example, for the many women who have in fact known all the information imparted by the form long in advance of visiting an abortion clinic, or for those who have waited 24 hours or more since being advised of such information by a personal physician. Again, while we do not hold that the provision is not reasonably related to the interest it seeks to further, and without deciding whether the interest asserted has been shown to be compelling, we conclude that the state has failed to establish that the waiting period is "necessary" to serve that interest.

F.Supp. at 551 ("it has not been demonstrated that the 48–hour waiting period would induce

## B. The Consent Form

■ The statute's requirement that a woman's consent be obtained on a state-prescribed form conveying specified information presents perhaps the most difficult of all the questions of law and policy before us. Our analysis of this provision begins with a review of the holding of and the issues left unresolved by the Supreme Court's decision in *Danforth*. That decision *inter alia* sustained a provision of a Missouri statute that required a woman seeking an abortion to certify in writing that she had given her free and informed consent to the procedure, and then added a somewhat cryptic footnote whose import is central to our deliberation:

> "The appellants' vagueness argument centers on the word 'informed'. One might well wonder, offhand, just what 'informed consent' of a patient is. The three Missouri federal judges who composed the three-judge District Court, however, were not concerned, and we are content to accept, as the meaning, the giving of information to the patient as to just what would be done and as to its consequences. To ascribe more meaning than this might well confine the attending physician in an undesired and uncomfortable straitjacket in the practice of his profession." 428 U.S. at 67, n. 8, 96 S.Ct. at 2840, n. 8.

Appellants read this language as establishing the outer limits of permissible state intervention into the informed consent process, asserting that the state may do no more than mandate whatever consent procedure good medical judgment would indicate without unduly burdening a woman's right to decide on an abortion free from state interference. Appellees, by contrast, contend that both the ability to prescribe information and the specific information contained in the DPH form are essential to the state's attempt to ensure informed consent, and that *Danforth* therefore necessarily entails that both must be permissible.

any women to rethink their position").

Subsequent to *Danforth*, the Supreme Court has provided its only guidance on this matter in summary affirmances of two lower court decisions that addressed two widely different information requirements with opposite results: *Freiman v. Ashcroft*, 584 F.2d 247 (8th Cir. 1978), *aff'd*, 440 U.S. 941, 99 S.Ct. 1416, 59 L.Ed.2d 630 (1979), which held unconstitutional a statute requiring a physician to inform a patient that a live infant born after an attempted elective abortion would become an abandoned ward of the state; and *Planned Parenthood Ass'n v. Fitzpatrick*, 401 F.Supp. 554 (E.D.Pa. 1975), *aff'd*, 428 U.S. 901, 96 S.Ct. 3202, 49 L.Ed.2d 1205 (1976), which among many other holdings held constitutional a requirement that a patient be informed of procedures, alternatives, and possible side effects. Each statute left the particular information to be provided to the medical judgment of the physician; neither involved a state-prescribed form of any kind. Without attributing undue significance to summary affirmances, *see Mandel v. Bradley*, 432 U.S. 173, 176, 97 S.Ct. 2238, 2240, 53 L.Ed.2d 199 (1977), we think those decisions can appropriately be viewed as identifying clear cases of permissible and impermissible information requirements, although they shed no light on the validity of prescribed forms.

We approach the use of such forms in terms of the familiar balancing of burdens imposed and interests served, and begin with the fact that the right implicated by this requirement is the fundamental privacy right extended to the abortion decision by *Roe v. Wade, supra*. But assessing the peculiar nature of the burdens potentially imposed by this provision requires further subdividing that right into what we believe to be its two components. One prong of the right protects the process of the decision, guarding against intrusions into the physician-patient relationship essential to the course of decisionmaking; the second prong protects the outcome of the decision, providing a shield against state requirements that attempt to skew the choice one way or another. *Cf.* note 18 *infra*. We consider first the potential burdens imposed on each of these fundamental rights, and then address the interests asserted in justification of those burdens.

Whether the "process" aspect of the right is burdened is in some respects a more fundamental inquiry. If the privacy of the physician-patient relationship is unduly burdened by the required use of a prescribed consent form then no such form is permissible, while an undue burden on the outcome of decisions can result only from the content of a particular form. *Cf. Akron Ctr. for Reproductive Health v. City of Akron, supra*, 479 F.Supp. at 1203 ("The state cannot go beyond [requiring that all abortion patients be counselled] to specify what each patient must be told.") We conclude that the use of a specified form comes close to an impermissible intrusion into the physician-patient relation, but that several features of the statute before us save the requirement here from invalidity. First, the statute does not require a physician personally to read any prescribed statement to any patient. *Cf. Charles v. Carey, supra*, 627 F.2d at 784 (requirement that physician personally conduct informed consent consultation; "The burdensomeness of this requirement is evident."); *Freiman v. Ashcroft, supra*, 584 F.2d at 249–52 (holding unconstitutional a requirement that a physician personally inform a woman of objectionable information). Moreover, the statute does not require that the form be received or signed at the physician's office, and the state has consistently represented that it intends to make the forms widely available. In addition, there is no requirement that a physician or anyone else discuss the form with a patient or even verify that she has read it. The patient's signature itself need attest only to the fact that she has "received" the form, and the form is not burdensomely long. Finally, the physician remains completely free to give any additional information desired regarding abortion, whether complementary to or contradictory of the information contained in

the DPH form.[14] Considering all these factors, and reiterating that any such requirement comes close to an impermissible interference, we conclude that any intrusion here is at most *de minimis* and that the use of the state-prescribed form is not in itself a violation of due process.[15]

We also conclude that the privacy of the decisional process is not unduly interfered with by use of the consent form as a whole on any of the other grounds pressed by appellants. First, they assert that the statute does not adequately protect the privacy of the consent form, both because it allows parents to obtain access to the form even where their consent is not required and because the seven-year record retention requirement is simply too long. We think the former stems from a misreading of the statute; we read it, as the state has consistently done, as allowing parents access to the form only where their approval was necessary for a particular abortion; as to the latter, we simply think a seven-year retention period to be within the reasonable record-keeping regulations. specifically sanctioned in *Danforth*, 428 U.S. at 80–81, 96 S.Ct. at 2846–2847. Second, appellants contend that the use of the term "unborn child" in the statute violates the free exercise clause by imposing a religious belief on the patient and the physician. Assuming without deciding that the appellants have standing to make this argument, we are content to hold that no free exercise rights have been violated here because the DPH form, the only document with which the physician or patient ever actually come into contact, refers only to the "embryo". Third, appellants argue that the singling-out of abortion for such consent-form requirements constitutes a denial of the equal protection of the laws; we believe our discussion of appellants' earlier equal protection claims to be substantially applicable here as well, and reject this argument accordingly.

We thus turn to consider whether any of the specific provisions of the form before us impermissibly burden the outcome of the decision,[16] beginning with an inquiry into how the question of burden is to be analyzed in this context. A provision affects an outcome to the extent that it leads a woman not to have an abortion where she would otherwise have had one.[17] But whether such an effect constitutes a burden is more elusive. Appellees argue that far from burdening the decision this outcome promotes its freedom and rationality; appellants maintain that those qualities are frustrated in such instances.[18] As with the

---

14. The broad scope available to physicians to provide whatever information they choose is illustrated by the affidavit of the Commissioner of Public Health, stating in part that in

"prescribing [the DPH] forms, I do not intend to limit *in any way* the right and responsibility of physicians to provide medical advice in the context of their medical practice." (emphasis added).

15. We note further that, particularly where a statute prescribes criminal penalties for a physician's failure to obtain adequate informed consent, the use of a prescribed form serves the important purpose of avoiding undesirable vagueness. While some courts have rejected the argument that statutes requiring a physician to obtain a patient's informed consent without specifying the content of that consent are unconstitutionally vague, *see, e. g., Women's Services, P.C. v. Thone, supra*, 483 F.Supp. at 1047, we nonetheless think it clear that the greater clarity and specificity derived from use of the form are significant benefits. *Cf. Margaret S. v. Edwards, supra*, 488 F.Supp. at 209. This is particularly true where the prescribed

form sets forth permissible information in a clear and neutral manner, as our later discussion makes clear we find to be the case here.

16. The provisions of the informed consent form may be said to be material only to the extent that they differ from the prevailing medical standard of desirable information. Insofar as they require only what a physician would do in their absence, they are on the one hand unnecessary but on the other untroubling. In assessing the statute's burdens and benefits, then, the critical cases are those in which information contained in the form would not be provided in the exercise of standard medical care.

17. An estimate provided by one of appellants' experts indicated that up to 3% of the women who came to him for abortions might change their decision upon reading the DPH form.

18. Both appellants and appellees have framed the issue as one of deciding whether the provisions of the statute foster or impede decision-making that is "free" and "rational"—two con-

waiting-period requirement, each provision's impact must be measured in those situations in which being required to read it would change a woman's decision. Again the question which would be a woman's "true" choice in such a case seems susceptible of no confident or systematic answer, again the state has assumed decisions made under one condition to be better than those made under the other, and again we find such an assumption highly speculative.

But this assumption plays a very different role in our analysis here than it did with respect to the waiting period. There we had found the requirement to impose independent burdens, and we looked to this rationale to determine whether the state had demonstrated that the waiting period was necessary to any compelling state interest. Our conclusion that it had not, however, is not equivalent to a finding that the state's assumption itself is unsupportable. In light of the fact that not to make one assumption is to make the other, and given the highly speculative nature of either, we are reluctant to hold that the state's reliance on one assumption is not within its legislative discretion. This reluctance is tempered, however, by two considerations. The first is the fact that the potential harm from the state's judgment involves a burden on a fundamental right, a danger against which courts must be especially vigilant. The second is our view that the inquiry called for is in important respects similar to one familiar to courts from the

law of evidence—whether as a matter of law the "prejudicial" effect of even admittedly relevant information outweighs its "probative" value. *Cf.* Weinstein & Berger, *2 Weinstein's Evidence* ¶ 403[01] at 403–7 (1980) (" '[R]elevancy is not always enough. There may remain the question, is its value worth what it costs?' Will the search for truth be helped or hindered by the interjection of distracting, confusing, or emotionally charged evidence?"), *quoting* McCormick, *Evidence* § 152 at 319 (1954). This is indeed the only inquiry to be made in this context, for the claim that the information fosters informed consent constitutes the full extent of the state's asserted justification, while with one exception not here relevant [19] the promotion of irrational decisions constitutes the sole reasonable possibility of a burden. To strike this balance we must address each element of the prescribed form individually.

We begin with two provisions which we believe clearly permissible, essentially those which were specifically approved in the *Danforth* footnote quoted above. First, the requirement that the form describe "the type of procedure which the physician intends to use to perform the abortion" seems entirely unobjectionable. We recognize, of course, that a form implementing such a facially neutral directive could nonetheless constitute an impermissible burden. But we have before us the DPH form actually implementing the requirement here, and we find its description fair and balanced, and thus equally unobjectionable.[20] We reach a

---

cepts notoriously fraught with complexity and uncertainty. We view the issue in terms of the familiar balancing of privacy rights and state interests, but we recognize that these more intractable concepts are necessarily implicated in that analysis. Indeed, the "process" prong of the privacy right identified above reflects in different terms the concern for the freedom of the decision while the "outcome" prong relates to its rationality. Similarly, that our analysis below allows "probative" but not "prejudicial" information to be conveyed may be seen as an attempt to protect the rationality of the decision, while our discussion of the limits on the ways in which the state can require the information to be conveyed are responsive to the need to ensure the freedom of the process. Our ability to affect the factors influencing these qualities is of course limited in two ways:

we can constrain only those imposed by the state, and we can constrain those only by declaring what they may not do.

**19.** Appellants argue that, in addition to obstructing rational decisionmaking, the required reading of the prescribed information imposes direct burdens on the abortion decision by inflicting emotional and perhaps physical injury upon at least some women. We think this position to be tenable only with respect to the final element of the form to be discussed, the fetal description section, and consider it as part of our analysis of that section.

**20.** Appellants challenge the form's description of procedures as both under-inclusive and over-inclusive, arguing that it both fails to list certain procedures that could conceivably be em-

similar conclusion as to the requirement that the form describe "the possible complications associated with the use of the procedure and with the performance of the abortion itself". Again it is possible to imagine a form that described these possibilities in an impermissible manner, but such is clearly not the case with the form before us.[21] *Accord, Planned Parenthood Ass'n v. Ashcroft, supra*, 483 F.Supp. at 699; *Women's Community Health Ctr., Inc. v. Cohen, supra*, 477 F.Supp. at 549.

The next two aspects of the form give us greater pause at the outset, each for the same reason. Neither a description of "the availability of alternatives to abortion" nor "a statement that, under the law of the Commonwealth, a person's refusal to undergo an abortion does not constitute grounds for the denial of public assistance" bears directly on any medically relevant factor. Thus neither fits easily within the traditional ambit of informed consent, which has generally been confined to the disclosure of matters within the special knowledge or expertise of the physician. But that traditional understanding has been derived from the role played by informed consent as a malpractice litigation doctrine, a context in which doctors are individually held responsible for the dispensation of certain information and in which it makes eminent sense to limit their obligation to matters within their special competence.[22] Here, by contrast, no concern for physician liability is present; the sole question is whether the

information would serve to make a woman better informed or not. As a result, while ensuring disclosure of adequate medical information may be the central concern of the consent form requirement, the appropriate threshold criterion for permissible information is not medical relevance narrowly construed but simply relevance—construed broadly, as in the evidence context, as encompassing any information that may affect the outcome of the decision. We think these two aspects of the form are well within that range.

But this threshold determination of relevance serves only to raise again the central question of whether these sections are more probative or prejudicial—whether they would help a woman reach a free and rational decision or obstruct her so doing. Despite their irrelevance to medical questions, these aspects of the consent form could for at least some women represent desired, material, and "probative" information. At the same time, we do not see nor do appellants point to a likelihood that these relatively neutral statements, concerning matters about which many women may well be otherwise uninformed, could significantly "prejudice" a woman's decision. Thus, on balance, we are not prepared to conclude either that the two requirements burden the fundamental right implicated or that they bear no reasonable relation to the state interest advanced, and we hold them constitutionally permissible.[23]

ployed and that as to each patient it lists procedures that will not in fact be employed. We find neither of these contentions to render the form unconstitutional, believing the range of procedures described reasonable and within the state's discretion, particularly in light of the physician's ability to provide any additional information desired.

21. Appellants challenge this provision on the ground that requiring disclosure of "*all* possible complications . . . however remote or improbable" (their emphasis) would run counter to good medical judgment, and would increase the harm to a patient and the likelihood of an *irrational decision*. We do not read the statute as dictating, or the DPH form as representing, such a draconian interpretation of "possible complications"; were they to do so, a different case would be presented. In addition, the DPH

form has specifically avoided the potentially troubling problem of asymmetry—it does not, for example, emphasize emotional difficulties possibly attendant upon abortion while ignoring those possibly attendant upon childbirth. Appellants also challenge the description of possible complications in the DPH form as "not *entirely accurate or complete*", but they do not assert any specific or material inaccuracies.

22. *See* note 12 *supra* and sources cited there.

23. We note that the DPH form has made both information requirements less objectionable than they might appear from the face of the statute. While the statute calls only for a one-sided statement that a decision *not* to undergo an abortion does not constitute grounds for the denial of public assistance, the form balances

*Accord, Leigh v. Olson, supra,* 497 F.Supp. at 1346–47; *Planned Parenthood Ass'n v. Ashcroft, supra,* 483 F.Supp. at 699.

The final element of the consent form, and the most troubling, is the requirement that it contain "a description of the stage of development of the unborn child". We note at the outset that every other court to have considered fetal description provisions has held them unconstitutional, although each apparently faced a description significantly more graphic than that presented here. In *Charles v. Carey, supra,* the Seventh Circuit held unconstitutional a requirement that a woman read statements concerning "organic pain to the fetus" and view illustrative material describing "probable anatomical and physiological characteristics of the fetus." In *Leigh v. Olson, supra,* and *Planned Parenthood v. Ashcroft, supra,* two courts held unconstitutional identical requirements that a physician discuss "probable anatomical and physiological characteristics of the unborn child at the time of the abortion". Finally, in *Akron Ctr. for Reproductive Health v. City of Akron, supra,* the court, suggesting that any state-prescribed information would be impermissible, held unconstitutional a required description of "anatomical and physiological characteristics of the particular unborn child."

We believe much of what we have said earlier to be equally applicable here. Once again the question whether the requirement

burdens or protects the decisionmaking process is a difficult one. But we conclude that the factors identified above ultimately dictate the conclusion that this requirement is impermissible. First, the information is not directly material to any medically relevant fact, and thus does not serve the concern for providing adequate medical information that lies at the heart of the informed consent requirement. Second, the uncontradicted expert testimony at the hearing below[24] indicated that requiring women seeking abortions to read this information would cause many of them emotional distress, anxiety, guilt, and in some cases increased physical pain—and it is of course by its impact on women in that stressful situation, rather than on judges or other detached readers, that the information must be measured. In addition, these effects might well be thought likely to be even greater for certain classes of women for whom the abortion decision is intrinsically more stressful, including those who had been rape victims, who were very young, or who sought an abortion because of danger to their own health or indications that the fetus they were carrying might be born deformed.[25] Third, uncontradicted testimony indicated that this description presents no information whose essence most if not all women do not understand before receiving it.[26] Contrary to the state's sug-

---

the effect of that information by adding the symmetrical fact that a decision to *have* an abortion also does not constitute grounds for such a denial. The form's description of alternatives to abortion is concise and neutrally phrased.

**24.** All expert testimony was based upon a view of an earlier draft of the consent form, which the parties agree did not differ materially from the final form. Appellants asserted that expert testimony was used rather than direct testimony by women both because of the sensitivity of the area and because no women had had actual experience with the form.

**25.** Other testimony indicated that some women, perhaps especially those least able to understand the information well, would interpret the requirement that they read it as punishment for their decision.

**26.** The parties offer conflicting interpretations of the testimony as to whether and how abortion counsellors provided information about fetal development to women who requested it. Appellees point to a counsellor's testimony that she would go to "great lengths" to avoid describing physical characteristics of a fetus. Appellants assert that in context this testimony referred only to specific descriptions of characteristics such as "hands and feet", and that the witness testified that she would answer affirmatively if asked whether the fetus had human-like characteristics. They also argue that the testimony as a whole demonstrates that the few questions received by counsellors about fetuses refer only to such matters as size and mass, and that those questions are answered accurately. It is sufficient for purposes of our analysis to conclude that this testimony does not reveal that counsellors provide any inaccurate or misleading information which might require corrective state-prescribed information.

gestion, the adequacy of a woman's knowledge need not—and should not—be gauged solely by the information imparted at the time an abortion is performed. It seems clear, moreover, that any woman who could understand the form would already be aware of the central consequence of an abortion; insofar as it merely presents information that is already known in a more unsettling form, the description presents a classic hallmark of prejudicial evidence. Finally, as the second and third factors would suggest, the uncontradicted testimony indicated both that most women would not want to hear such a description just prior to having an abortion and that most physicians would not consider it good medical practice to provide one, further demonstrating that the information serves as an enforced, unwelcome, and medically contraindicated state lecture.[27] *Cf. Planned Parenthood Ass'n v. Ashcroft, supra,* 483 F.Supp. at 698 ("It is evident that [many] physicians, in the exercise of their best medical judgment, would choose not to provide their patients seeking abortions with a detailed anatomical description of the fetus."); *Leigh v. Olson, supra,* 497 F.Supp. at 1345 (such information "may have an adverse medical effect on the patient").

Indeed, all these factors taken together suggest that the primary import and perhaps the primary purpose of the required information is not so much factual as it is moral—a dimension that seems substantially to overlap the probative/prejudicial continuum that we have found useful in analyzing these issues. To the extent that information may be imposed by the state it must be neutral and objective; coercive state indoctrination of particular values or ethical judgments is objectionable to First

as well as Fourteenth Amendment principles. The state may not add to its presentation of material facts such a moral overlay, an attempted imposition of ideas that is particularly objectionable in connection with the exercise of fundamental rights.

Thus, this requirement presents a very different situation than do the others. It imposes clear burdens on a fundamental right by presenting irrelevant and potentially prejudicial information, inflicting emotional distress, constituting an undesired intrusion, and perhaps representing an attempt at moral indoctrination. Arrayed against these impositions we find a complete lack of state interests served—no material information conveyed that is not previously known or could not otherwise be presented.[28] We recognize that the particular fetal description before us is a relatively brief and dispassionate one, and thus not as blatantly offensive as those held unconstitutional by other courts.[29] But as the evidence at trial indicated, the burdens described above flow from the very fact that women are required to read a prescribed fetal description, and the failure to serve any state interest is equally true of all such descriptions. In addition, were we to hold that some such provision might be constitutionally permissible, courts would face the prospect of repeatedly being called upon to edit or fine-tune offensive descriptions in the absence of any clear criteria. We therefore conclude that the only appropriate judicial response to such descriptions is to prohibit them altogether.

*Other Preliminary Injunction Criteria*

■ We have discussed appellants' claim thus far principally in terms of one element of the preliminary injunction standard set forth above, that of their likelihood of suc-

---

**27.** In addition, we note that as implemented by the Department of Public Health the description provides information about fetuses at all stages of development within the relevant trimester, rather than simply at the time at which a particular woman seeks an abortion, thus imposing clearly irrelevant and potentially misleading information.

**28.** Because we hold that the information serves no state interest at all, we need not consider

how closely the statute would fit the interest asserted. We note, however, that it does not appear narrowly tailored, since again it fails to take any account of women who would already have learned precisely this information before receiving the form.

**29.** Appellants do not contend that the fetal description provided on the DPH form is factually inaccurate in any material respect.

cess on the merits. Having concluded that they have demonstrated a sufficient likelihood as to certain provisions of the act, we must now determine whether they have met the other three elements of their burden with respect to those provisions. We conclude that they have, for in the particular circumstances of this case we think a conclusion that a particular requirement is probably unconstitutional necessarily entails a decision as to the other preliminary injunction criteria as well.

This effect can be seen most directly with regard to the question of irreparable harm. Each party has alleged that it will be irreparably harmed by an adverse decision on the merits, and we agree that either enjoining or not enjoining enforcement of the statute may well cause serious and permanent effects: issuing an injunction may result in some women having abortions that they would not have had if the affected provisions had been in effect, while denying an injunction may result in other women not having abortions that they would otherwise have had. The parties differ, of course, only as to which of these effects constitutes irreparable harm and which promotes free choice and truly informed consent; our answer necessarily turns on whether we find the requirements at issue likely to be constitutional or unconstitutional. Similarly, we think it clear that, since they in turn depend upon the possibilities of harm, both the balance of the equities and the public interest in this case also follow directly from a conclusion as to the probable outcome on the merits. Accordingly, we conclude that appellants have satisfied all the requirements for a preliminary injunction as to those provisions of the act for which they have demonstrated a likelihood of success on the merits, and have satisfied none as to the others.

*Conclusion*

■ Because we have held that appellants are entitled to a preliminary injunction only as to certain aspects of the statute, the final question we must consider is whether the unenforceable provisions are severable from the enforceable ones. The overall statutory scheme includes an unusually explicit severability clause:

> "If any section, subsection, sentence or clause of this act is held to be unconstitutional, such holding shall not affect the remaining portions of this act." 1974 Mass. Acts ch. 706, § 2.

In light of this clear legislative intent, and in light of the fact that the sections remaining in effect after our decision form a coherent and comprehensible regulatory system, we hold that they may take effect. *See United States v. Jackson,* 390 U.S. 570, 585, 88 S.Ct. 1209, 1218, 20 L.Ed.2d 138 (1968); *Charles v. Carey, supra,* 607 F.2d at 779.

In sum our holding is as follows. Appellants have demonstrated a likelihood of success on the merits of their claim that the statute is unconstitutional with respect to two of its provisions: first, that no abortion be performed until at least twenty-four hours after a woman has signed a consent form, and second, that the consent form contain a fetal description section. They have not done so with respect to two other matters: the use of a state-prescribed form or the other sections of that form, and the requirement that unmarried minors obtain parental or judicial approval prior to having an abortion. In addition, we conclude that all other requisites to a preliminary injunction in this case follow from a conclusion as to the likely outcome on the merits. Finally, we hold the probably unconstitutional provisions of the statute severable. Accordingly, we order that a preliminary injunction issue as to the provisions that we have found are likely to be unconstitutional, and vacate our stay of enforcement as to the other provisions.

*Affirmed in part, vacated in part, and remanded.*

### APPENDIX 1
### ABORTION—INFORMED CONSENT

Chap. 240. AN ACT FURTHER REGULATING THE LAW CONCERNING INFORMED CONSENT PRIOR TO ABORTION.

*Section 12S.* No physician may perform an abortion upon a pregnant woman with-

out first obtaining her written informed consent. The commissioner of public health shall prescribe a form for physicians to use in obtaining such consent. This form shall be written in a manner designed to permit a person unfamiliar with medical terminology to understand its purpose and content, and shall include the following information: a description of the stage of development of the unborn child; the type of procedure which the physician intends to use to perform the abortion; and the possible complications associated with the use of the procedure and with the performance of the abortion itself; the availability of alternatives to abortion; and a statement that, under the law of the commonwealth, a person's refusal to undergo an abortion does not constitute grounds for the denial of public assistance. A pregnant woman seeking an abortion shall sign the consent form described above at least twenty-four hours in advance of the time for which the abortion is scheduled, except in an emergency requiring immediate action. She shall then return it to the physician performing the abortion who shall maintain it in his files and destroy it seven years after the date upon which the abortion is performed.

The said consent form and any other forms, transcript of evidence, or written findings and conclusions of a court, shall be confidential and may not be released to any person except by the pregnant woman's written informed consent or by a proper judicial order, other than to the pregnant woman herself, to whom such documents relate, the operating physician, or any person whose consent is required pursuant to this section, or under the law. If a pregnant woman is less than eighteen years of age and has not married, a physician shall not perform an abortion upon her unless he first obtains both the consent of the pregnant woman and that of her parents, except as hereinafter provided. In deciding whether to grant such consent, a pregnant woman's parents shall consider only their child's best interests. If one of the pregnant woman's parents has died or is unavailable to the physician within a reasonable time and in a reasonable manner, con-

sent of the remaining parent shall be sufficient. If both parents have died or are otherwise unavailable to the physician within a reasonable time and in a reasonable manner, consent of the pregnant woman's guardian or guardians shall be sufficient. If the pregnant woman's parents are divorced, consent of the parent having custody shall be sufficient. If a pregnant woman less than eighteen years of age has not married and if one or both of her parents or guardians refuse to consent to the performance of an abortion, or if she elects not to seek the consent of one or both of her parents or guardians, a judge of the superior court department of the trial court shall, upon petition, or motion, and after an appropriate hearing, authorize a physician to perform the abortion if said judge determines that the pregnant woman is mature and capable of giving informed consent to the proposed abortion or, if said judge determines that she is not mature, that the performance of an abortion upon her would be in her best interests. A pregnant woman less than eighteen years of age may participate in proceedings in the superior court department of the trial court on her own behalf, and the court may appoint a guardian ad litem for her. The court shall, however, advise her that she has a right to court appointed counsel, and shall, upon her request, provide her with such counsel. Proceedings in the superior court department of the trial court under this section shall be confidential and shall be given such precedence over other pending matters that the court may reach a decision promptly and without delay so as to serve the best interests of the pregnant woman. A judge of the superior court department of the trial court who conducts proceedings under this section shall make in writing specific factual findings and legal conclusions supporting his decision and shall order a record of the evidence to be maintained including his own findings and conclusions.

Nothing in this section is intended to abolish or limit any common law rights of persons other than those whose rights it governs for the purpose of any civil action

or any action for injunctive relief under section twelve U.

## APPENDIX 2

### COMMONWEALTH OF MASSACHUSETTS

#### SUPERIOR COURT DEPARTMENT

*STANDING ORDER NO. 12–80*

*[Applicable to all Counties]*

*Effective September 3, 1980*

(Subject: Uniform Procedure for Processing A Petition Or Motion Seeking Authorization For an Abortion Under G.L. c. 112, § 12S, Inserted By St.1980, ch. 240)

(1) Upon the filing of a petition or motion (petition) under G.L. c. 112, § 12S, inserted by St.1980, ch. 240 (a copy of which is attached), the Clerk-Magistrate (clerk) shall immediately bring the matter to the attention of the justice sitting in the civil motion session, or if no such session is being held, to a jury-waived session. If no jury-waived session is being held at that time, the petition shall be brought to the judge sitting in a civil jury session. If there are neither civil motion, jury-waived nor civil jury sessions, the matter shall be brought before any justice sitting in any other session. In any event, the matter shall be given priority over all other cases then pending "so that the court may reach a decision promptly and without delay so as to serve the best interests of the pregnant woman." G.L. c. 112, § 12S, inserted by St.1980, ch. 240. In this regard, the court should not decline to decide a case brought under § 12S because of any pleading omissions or other technical defects and shall assist the minor, particularly if unrepresented by counsel, in presenting relevant facts and by liberally construing the pleadings. (A copy of a form petition, which is to be made easily available to petitioners, is attached.)

If the petition is filed in a county in which no session is being held, the clerk of court who received the petition shall immediately notify the Chief Justice of the Superior Court by telephone of the pending peti-

tion. The Chief Justice shall then take such action as is necessary to reach a decision promptly and without delay so as to serve the best interests of the pregnant woman.

(2) Although § 12S permits a pregnant woman less than eighteen years of age to participate in proceedings in the Superior Court Department in her own behalf, it is preferable that the minor be represented by counsel. The statute requires that the court advise her that she has a right to court-appointed counsel and that the court shall, upon her request, provide her with such counsel.

Also, the court may appoint a guardian *ad litem* to represent the minor or may make such other orders as necessary pursuant to Mass.R.Civ.P. 17(b). The compensation for counsel and/or for the guardian *ad litem* shall be certified by the justice as an expense incident to the operation of the court. If the minor requests waiver of costs and fees, as provided by St.1980, c. 539, such costs and fees are to be waived.

(3) As provided by § 12S, all proceedings shall be confidential and all pleadings and other papers filed shall be designated anonymously. For example, the proceedings shall be titled Mary Moe, Mary Doe, etc. If the minor files papers which do not insure her anonymity, the court shall have the papers processed in a manner which will insure anonymity and shall return the defective papers to the minor or her counsel. An affidavit shall accompany the papers in the case. Such affidavit shall reveal the minor's true identity. The affidavit shall be sealed in an envelope which will be identifiable by having the docket number of the case inscribed upon it. All such envelopes shall be kept in a separate file by the clerks of the various courts. All papers in the proceedings shall be impounded.

The clerks of the various court should undertake to insure that the minor's contact with the clerk's office is confidential and expeditious to the fullest extent practicable. For example, assistance in filing a petition should be provided in a confidential setting, such as a private office. Similarly, one or

more persons in the clerk's office should be at all times available to answer questions asked by a minor, either in person or by phone, and to assist the minor in expeditiously presenting her petition to the court. Each clerk shall designate one or more persons to receive and process § 12S petitions and shall insure that one such person is available to insure prompt treatment.

(5) All proceedings under c. 112, § 12S, shall be conducted jury-waived with a court reporter present. The statute requires the court to make in writing specific factual findings and legal conclusions supporting his or her decision and to order that a record of evidence be maintained which includes his or her own findings and conclusions.

s/
Administrative Justice of the
Superior Court Department

Dated: August 26, 1980

---

COMMONWEALTH OF
MASSACHUSETTS

---

SUPERIOR COURT DEPARTMENT

CIVIL ACTION NO.
(G.L. c. 112, § 12S)
IN THE MATTER OF MARY MOE

---

PETITION

1. This action is brought pursuant to G.L. c. 112, § 12S. By this action the plaintiff, a woman under the age of eighteen years, seeks an order of the Court permitting her to obtain an abortion.

2. The plaintiff is a resident of _____ City or Town in the County of _____, Massachusetts.

3. The plaintiff is ____ years of age and is unmarried.

4. The plaintiff believes that she is approximately ____ weeks pregnant.

\* Although this form is captioned "Second Trimester", the Commonwealth informs us that a

5. (Cross out the section which does not apply).

One or both of the plaintiff's parents or guardians have refused to consent to the performance of an abortion.

The plaintiff has decided not to seek the consent of one or both of her parents or guardians.

6. (Cross out if inapplicable).

The plaintiff is unable to pay the fees and costs of this proceeding.

WHEREFORE, the plaintiff requests:

1. That this Court enter an Order authorizing a physician to perform an abortion on plaintiff without parental consent.

2. That these papers be impounded, to protect the privacy of the plaintiff.

3. (Cross out if you do not desire to have fees and costs paid by the Court).

That this Court waive payment of all fees and costs by plaintiff.

4. (Cross out if you do not want a lawyer to assist you at no charge).

That this Court appoint an attorney to represent the plaintiff at the Commonwealth's expense.

[Please sign "Mary Moe" and sign the affidavit provided by the clerk using your own name].

Mary Moe

Date: _____

---

*APPENDIX 3*

SECOND TRIMESTER \*
ABORTION CONSENT FORM

NAME OF PATIENT: _____

I have received information prepared by the Massachusetts Department of Public Health that describes the development of the fetus, the procedures available for performing second trimester abortions, and the possible complications associated with each

substantially similar form is to be used for first trimester abortions.

procedure, including the one my doctor intends to use.

I have been advised that my doctor intends to use one of the following procedures: _____

_____

I hereby authorize my doctor to perform an abortion.

I understand that whether I decide to have or not to have an abortion, that would not be a reason for the denial of public assistance.

Date: _____    _____
                                Signature of Patient

_____

The patient's signature of this form at least 24 hours prior to the scheduled time for an abortion is required by state law, G.L. c. 112, s. 12S.

_____

## FIRST TRIMESTER ABORTIONS

This information is presented to you in connection with a form which state law requires you to sign 24 hours before you have an abortion, except in an emergency. The law requires the Department of Public Health to give you information concerning the development of the embryo, abortion procedures used, the possible complications associated with them, and the alternatives to abortion. Should you decide to carry your pregnancy to term but not to keep the child, you may place the child with a relative, or with another family through foster care or adoption.

### DEVELOPMENT OF THE EMBRYO

The first trimester is defined as approximately the first twelve weeks of pregnancy.

In the first few days after conception, the fertilized egg divides into a mass of cells as it travels from the Fallopian tubes into the uterus (womb). It then implants in the lining of the uterus. The inner cell mass becomes the embryo while the outer cell mass ultimately develops into the placenta (afterbirth).

Four weeks after conception, the embryo is a little less than approximately half an inch in length and the cells are continuing to multiply and develop differently.

At eight weeks of development, the embryo is about 1 inch in length. Main organ systems are formed and some external human-like physical characteristics are recognizable. This differentiation continues through the twelfth week by which time the embryo is approximately 2½ inches in length crown to rump.

### FIRST TRIMESTER ABORTION PROCEDURES

In an abortion the uterine contents are removed, leaving the uterus to return to its non-pregnant state.

The following two procedures are performed before the 13th week and on occasion up to 15 weeks from the start of the last menstrual period. Neither takes more than a few minutes. The first one is the one more commonly done in Massachusetts.

1. Dilation and Evacuation (D & E)
The cervix (opening of the uterus) is stretched open until a hollow vacuum tube can pass through the cervix into the uterus. The uterine contents are separated from the uterine lining and removed by suction.

2. Dilation and Curettage (D & C)
The cervix is stretched open and the uterine contents are separated from the uterine lining and removed by a small metal instrument.

These two procedures may be used either alone or in combination. To aid in either of these procedures, sometimes laminaria (a thin strand of woody substance) is inserted in the cervix 12 hours or more before the abortion, to help stretch the cervix.

First trimester abortions may be performed without use of anesthesia. Temporary cramping may be felt.

In most cases, local anesthesia called a paracervical block is used. It is injected around the cervix to numb the area.

If specially requested general anesthesia may be used, although this carries increased risks for the patient. An allergic reaction may occur due to the use of the anesthesia.

## MEDICAL COMPLICATIONS AND SAFETY

Complications requiring hospitalization are rare. Minor complications are infrequent. Complications include risk of infection, incomplete abortion, bleeding, continued pregnancy, or perforation of the uterine wall. Repeat abortions may increase the risk of miscarriage and premature delivery in any subsequent pregnancy.

According to figures from the Center for Disease Control of the U.S. Department of Health and Human Services, it is now safer to have a first trimester abortion that it is to have a baby.

LEVIN H. CAMPBELL, Circuit Judge (dissenting in part).

I agree in all respects, except I am unable to agree that the statutorily required information incorporated in the form concerning the stage of fetal development[1] unconstitutionally burdens the abortion decision. In contrast to the waiting period, which places a specific limitation upon a woman's right to put her choice of abortion into effect, the placing of this information in the form involves no functional obstacle. So much, indeed, is conceded by my brothers. Each woman is free to implement her choice without delay and without the need of anyone's consent; she need only certify that she has received a sheet of paper distributed by the state which she is free to discard and her physician is free to supplement, or even dispute. What causes my brothers concern is that the paper contains information—conceded to be "relatively brief and dispassionate"—which is thought to be medically immaterial and intrusive.

I can, however, find no acceptable theory of constitutional analysis which makes the requirement of providing this factual information a violation of the Constitution. If we assume, as the court does, and as I do, that the state is free to require the doctor to deliver objective information relative to the nature and risks of the abortion procedure which a patient might like to have, I do not see how we can exclude this purely factual information about the fetus. My brethren view it as medically irrelevant, and I suppose they are right if one thinks wholly in terms of the risks to the mother; but to say the fetus is irrelevant to an abortion is like saying the tonsils are irrelevant to a tonsillectomy. Certainly to some patients the stage of fetal development will be of perfectly rational interest; it tells the potential mother something about the embryo being aborted. Whether the information will be disheartening or encouraging to the patient is speculative: the description provided may encourage abortion, in that it demonstrates how little developed the fetus is at this stage; or perhaps it will produce a different reaction. But I do not understand by what canon of logic we can say that this information—all of it undisputed and factual, without a single emotional "buzz word" —is so irrelevant as to be constitutionally prohibited.

I realize that the physician is required by law to deliver the form; the physician becomes to that degree a coerced messenger. I realize also that the patient is, in some sense, a captive audience.[2] If the form contained partisan statements of opinion,

1. The information in question on the form to be used is as follows:
"*DEVELOPMENT OF THE EMBRYO*
The first trimester is defined as approximately the first twelve weeks of pregnancy.
In the first few days after conception, the fertilized egg divides into a mass of cells as it travels from the Fallopian tubes into the uterus (womb). It then implants in the lining of the uterus. The inner cell mass becomes the embryo while the outer cell mass ultimately develops into the placenta (afterbirth).
Four weeks after conception, the embryo is a little less than approximately half an inch in length and the cells are continuing to multiply and develop differently.
At eight weeks of development, the embryo is about 1 inch in length. Main organ systems are formed and some external human-like physical characteristics are recognizable. This differentation continues through the twelfth week by which time the embryo is approximately 2½ inches in length crown to rump."

2. *See Public Utilities Commission v. Pollak*, 343 U.S. 451, 72 S.Ct. 813, 96 L.Ed. 1068 (1952) (regulated transit company not prohibited by first amendment from playing radio programs on street cars, despite captive audience status

where the state was compelling the delivery and receipt of the particular point of view, a first amendment or due process clause violation might be indicated. The unwilling physician-messenger's own first amendment rights might be implicated. *Cf. West Virginia State Board of Education v. Barnette*, 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943).

But I do not see how this particular information can be placed in such a category. I realize my brothers wish to draw a line excluding information which tends to get the state embroiled in the ethical and religious abortion controversy. I can understand their reason for wishing to do so. However, I think this better done by drawing the line further along the road, where the distinction between propaganda and medical fact is more apparent. While any reference to the fetus may seem to be getting uncomfortably close to the ethical and religious phases of the matter, I simply do not see how one can fairly say that providing the patient with a dispassionate description of the stage of the fetus to be aborted is so unrelated to the state's interests in the general health and welfare as to warrant mandatory exclusion on constitutional grounds.

I would add that my brothers' tight line-drawing could have the peculiar effect of forbidding the state from including *any* factual information going to the broader social and public health aspects of an abortion. Thus it would seemingly be barred from including statistical information, assuming there were such, showing that infants born to mothers under fifteen had a much higher incidence of emotional disturbance and neglect. I do not think the Constitution forbids the transmission of information of that sort (assuming it were factual) any more than it would the present information.

of passengers, where programs not used for objectionable propaganda and where the utilities commission found, on the basis of substantial evidence, that programs were compatible with convenience, comfort, and safety of majority of passengers); *Lehman v. City of Shaker Heights*, 418 U.S. 298, 302, 94 S.Ct. 2714, 41 L.Ed.2d 770 (1973) (city transit service may refuse to accept political advertising because transit passengers are captive audience); *CBS v. DNC*, 412 U.S. 94, 127, 93 S.Ct. 2080, 2098, 36 L.Ed.2d 772 (1972) (FCC entitled to take into account the "captive audience" nature of television viewers in upholding broadcaster's policy of refusing political advertising). *Compare Consolidated Edison v. Public Service Commission*, 447 U.S. 530, 543, 100 S.Ct. 2326, 2336–2337, 65 L.Ed.2d 319 (1980) (restriction on utility company's bill inserts discussing controversial issues not justified as protecting captive audience); *Givhan v. Western Line Cons. Sch. Dist.*, 439 U.S. 410, 415, 99 S.Ct. 693, 696, 58 L.Ed.2d 619 (1979) (principal was not "unwilling recipient" of teacher's views, so that "captive audience" rationale did not prevent first amendment protection for her speech).