**Warren LECHTNER**

v.

**James BROWNYARD, d/b/a W. H. Y. P. Country Radio, Appellant.**

No. 81–2877.

United States Court of Appeals, Third Circuit.

Argued May 10, 1982.

Decided June 2, 1982.

MacDonald, Illig, Jones & Britton, John M. Wolford (argued), Charles D. Marlett, Erie, Pa., for appellant, James Brownyard, d/b/a W. H. Y. P. Country Radio.

Michael E. Dunlavey (argued), Orton, Joyce & Dunlavey, P. C., North East, Pa., for appellee, Warren Lechtner.

Before GIBBONS and HUNTER, Circuit Judges and THOMPSON, District Judge.*

## OPINION OF THE COURT

GIBBONS, Circuit Judge:

James Brownyard, the owner of W.H. Y.P. Country Radio, appeals from a judgment awarding to Warren Lechtner damages for violation of the Federal Communications Commission (FCC) Personal Attack Rule, 47 C.F.R. § 73.1920,[1] and for defamation under Pennsylvania law. We conclude that the complaint fails to state a claim arising under the laws of the United States, and that the judgment must be vacated.

### I.

In May 1980, James Brownyard, the owner of W.H.Y.P. Country Radio, transmitted a broadcast over the WHYP frequency in which he made certain remarks concerning Warren Lechtner, a member of the school board of North East, Pennsylvania. Thereupon Lechtner sued Brownyard for money damages for violation of the FCC's Personal Attack Rule, and asserted a pendent claim for defamation and slander under Pennsylvania law. The district court denied Brownyard's motion for summary judgment and proceeded with the matter through a jury trial. On June 4, 1981, the jury returned a verdict for Lechtner, awarding him actual and punitive damages for the state law claims and $500.00 in damages for Brownyard's failure to comply with the FCC Personal Attack Rule. Defendant then filed a motion for judgment notwithstanding the verdict or for a new trial, arguing that a private cause of action could not be implied from the FCC Personal Attack Rule regulations and that the court's exercise of pendent jurisdiction was improper.[2] Defendant's motion was denied, and this appeal followed.

### II.

The Personal Attack Rule was promulgated pursuant to the FCC's rulemaking

---

* Hon. Anne E. Thompson, United States District Judge for the District of New Jersey, sitting by designation.

1. The Personal Attack Rule provides as follows:

   **§ 73.1920  Personal attacks.**
   (a) When, during the presentation of views on a controversial issue of public importance, an attack is made upon the honesty, character, integrity or like personal qualities of an identified person or group, the licensee shall, within a reasonable time and in no event later than one week after the attack, transmit to the persons or group attacked:
   (1) Notification of the date, time and identification of the broadcast;
   (2) A script or tape (or an accurate summary if a script or tape is not available) of the attack; and
   (3) An offer of a reasonable opportunity to respond over the licensee's facilities.
   (b) The provisions of paragraph (a) of this section shall not apply to broadcast material which falls within one or more of the following categories:

   (1) Personal attacks on foreign groups or foreign public figures;
   (2) Personal attacks occurring during uses by legally qualified candidates;
   (3) Personal attacks made during broadcasts not included in paragraph (b)(2) of this section and made by legally qualified candidates, their authorized spokespersons, or those associated with them in the campaign, or other such candidates, their authorized spokespersons or persons associated with the candidates in the campaign; and
   (4) Bona fide newscasts, bona fide news interviews, and on-the-spot coverage of bona fide news events, including commentary or analysis contained in the foregoing programs.
   (c) The provisions of paragraph (a) of this section shall be applicable to editorials of the licensee, except in the case of noncommercial educational stations since they are precluded from editorializing (section 399(a), Communications Act).

2. Defendant also raised issues with respect to the merits of the state claims. We do not discuss these issues because they are unnecessary to our decision.

powers under the Communications Act of 1934, as amended, 47 U.S.C. §§ 303, 303(r)(Act). The regulation was upheld by the Supreme Court in *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969), against constitutional attack as a proper codification of the personal attack aspect of the FCC fairness doctrine. *See Democratic National Committee v. FCC*, 460 F.2d 891, 901–02 (D.C. Cir.), *cert. denied*, 409 U.S. 843, 93 S.Ct. 42, 34 L.Ed.2d 82 (1972) (personal attack rule is a corollary of fairness doctrine); *United States v. WIYN Radio, Inc.*, 464 F.Supp. 101 (N.D.Ga.1978); Notice of Proposed Rule Making, Personal Attack/Political Editorials, 31 Fed.Reg. 5710 (1966). Before it was codified in a rule the obligation to afford an opportunity for response to a personal attack was developed in case by case adjudication by the FCC. Public Notice of July 1, 1964 (Fairness Primer), 29 Fed.Reg. 10,415, 10,420–21 (1964); *Times-Mirror Broadcasting Co.*, 24 Rad.Reg. 404 and 407 (P & F 1962); *Clayton W. Mapoles*, 23 Rad.Reg. 586 (P & F 1962). The personal attack rule is, thus, a special application of "the general fairness requirement that issues be presented, and presented with coverage of competing views. . . ." *Red Lion, supra*, 395 U.S. at 378, 89 S.Ct. at 1800. The only variation is that the broadcaster is not given the option of presenting the attacked party's side himself or of choosing a third party to represent that side: the person attacked is afforded the opportunity to rebut.

Given the origin of the personal attack rule as an aspect of the fairness doctrine, a review of the historical development of that doctrine would be informative, and we quote from the Court's opinion in *Red Lion Broadcasting* :

Before 1927, the allocation of frequencies was left entirely to the private sector, and the result was chaos. It quickly became apparent that broadcast frequencies constituted a scarce resource whose use could be regulated and rationalized only by the Government. Without government control, the medium would be of little use because of the cacaphony of competing voices, none of which could be clearly and predictably heard. Conse-

quently, the Federal Radio Commission was established to allocate frequencies among competing applicants in a manner responsive to the public "convenience, interest, or necessity."

Very shortly thereafter the Commission expressed its view that the "public interest requires ample play for the free and fair competition of opposing views, and the commission believes that the principle applies . . . to all discussions of issues of importance to the public." *Great Lakes Broadcasting Co.*, 3 F.R.C. Ann.Rep. 32, 33 (1929), rev'd on other grounds, 59 App.D.C. 197, 37 F.2d 993, cert. dismissed, 281 U.S. 706 [50 S.Ct. 467, 74 L.Ed. 1129] (1930). This doctrine was applied through denial of license renewals or construction permits, both by the FRC, and its successor FCC. . . . After an extended period during which the licensee was obliged not only to cover and to cover fairly the views of others, but also to refrain from expressing his own personal views, . . . the latter limitation on the licensee was abandoned and the doctrine developed into its present form.

There is a twofold duty laid down by the FCC's decisions and described by the 1949 Report on Editorializing by Broadcast Licensees, 13 F.C.C. 1246 (1949). The broadcaster must give adequate coverage to public issues, . . . and coverage must be fair in that it accurately reflects the opposing views. . . . This must be done at the broadcaster's own expense if sponsorship is unavailable. . . .

[Moreover,] [t]he fairness doctrine finds specific recognition in statutory form, is in part modeled on explicit statutory provisions relating to political candidates, and is approvingly reflected in legislative history.

In 1959 the Congress amended the statutory requirement of § 315 [of the Act] that equal time be accorded each political candidate to except certain appearances on news programs, but added that this constituted no exception "*from the obligation imposed upon them under this Act to operate in the public interest and to*

*afford reasonable opportunity for the discussion of conflicting views on issues of public importance."* Act of September 14, 1959, § 1, 73 Stat. 557, amending 47 U.S.C. § 315(a) (emphasis added). This language makes it very plain that Congress, in 1959, announced that the phrase "public interest," which had been in the Act since 1927, imposed a duty on broadcasters to discuss both sides of controversial public issues. In other words, the amendment vindicated the FCC's general view that the fairness doctrine inhered in the public interest standard.

395 U.S. 367, 375–77, 380, 89 S.Ct. 1794, 1798–99, 1801, 23 L.Ed.2d 371 (1968) (footnotes and citations omitted). *See* 1949 Report on Editorializing by Broadcast Licensees, 13 F.C.C. 1246 (1949); *see also In re Obligation of Broadcast Licensees Under the Fairness Doctrine*, 23 F.C.C.2d 27, 28 (1970).

█ A licensee is thus required to operate in the public interest and has an obligation to present public questions fairly and without bias. S.Rep.No.562, 86th Cong., 1st Sess. 8–9, *reprinted in* [1959] U.S.Code Cong. & Ad.News 2564, 2571–76. The fairness doctrine is a method for allocating scarce electromagnetic broadcasting resources among various individuals, events and ideas seeking expression. The Personal Attack Rule is one means whereby the FCC safeguards the public's interest in receiving information on all aspects of an issue.

█ Although the Personal Attack Rule is "to foster 'wide open, robust debate on issues of public importance' . . . [and] not to use the public airwaves to vindicate private reputation; it is rather to advance public debate of public issues," *Straus Communications, Inc. v. FCC*, 530 F.2d 1001, 1007–08 (D.C.Cir.1976), it is clear that the person or group actually attacked also benefits from the rule. Rebuttal through broadcasting may be the most efficient, if not the only, means by which a victim of an attack can undo the harm done by an earlier broadcast. The victim generally will not have the resources to reach as wide an audience as the licensee. Thus if the licensee violates the Personal Attack Rule, the attacked individual is substantially harmed.

In this case, plaintiff asserts a private cause of action under the Personal Attack Rule. He urges that when an individual seeks damages in a federal court for injury from the violation of a federal standard of conduct he should be able to obtain such damages. He argues that since the regulation at issue is federal, was properly promulgated, and has the force of law, a complaint under it ought to satisfy the "arises under" requirement of 28 U.S.C. § 1331, and a federal court should properly exercise federal question jurisdiction. He contends that the federal courts should be able to award damages where a plaintiff has suffered harm caused by the contravention of a federal regulation which sets a standard of behavior. Moreover, nothing in the Communications Act of 1934, or its legislative history, indicates a congressional intent to preempt the normal functioning of federal courts with respect to complaints of harm caused by violations of federal regulations. *Cf. Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388, 398–408, 91 S.Ct. 1999, 2005–2010, 29 L.Ed.2d 619 (1971) (Harlan, J., concurring) (absent manifest congressional restrictions or substitution of remedies, a federal court has the power and competence to grant damages for violation of fourth amendment rights).

The Supreme Court has adopted essentially the above analysis in establishing a right to damages for harm arising out of violations of constitutional prohibitions despite the absence of any statute conferring such a right. *See Carlson v. Green*, 446 U.S. 14, 100 S.Ct. 1468, 64 L.Ed.2d 15 (1980); *Bivens, supra.* In *Carlson* the court determined that a plaintiff injured by a constitutional violation had a right to recover damages in federal court unless there were "special factors counselling hesitation in the absence of affirmative action by Congress," *id.* at 18, 100 S.Ct. at 1472, or Congress had provided alternative remedies "which it explicitly declared to be a *substitute* for recovery directly under the Consti-

tution and viewed as equally effective." *Id.* 18–19, 100 S.Ct. at 1472. If a constitutional violation is alleged, there is federal question jurisdiction. Once an individual is harmed, a federal court is deemed competent and empowered to grant relief unless special circumstances or an affirmative congressional pronouncement indicate otherwise.

If we were to apply the analysis in the cases from *Bivens* to *Carlson* to private complaints of Personal Attack Rule violations, we would rule that a federal court could award damages relief to one injured by such a violation because there is no affirmative congressional intent to prohibit the entertainment of such suits. The United States Supreme Court, however, has developed a dichotomous analysis for deciding whether a federal court can entertain suits stemming from violations of statutory provisions. *Transamerica Mortgage Advisors, Inc. v. Lewis,* 444 U.S. 11, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979); *Touche Ross & Co. v. Redington,* 442 U.S. 560, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979). Central to this analysis is the tenet: "[T]he fact that a federal statute has been violated and some person harmed does not automatically give rise to a private cause of action in favor of that person." *Cannon v. University of Chicago,* 441 U.S. 677, 688, 99 S.Ct. 1946, 1952, 60 L.Ed.2d 560 (1979). The question of whether a statute creates a cause of action is a matter of statutory construction. *See Middlesex County Sewerage Authority v. National Sea Clammers Association,* 453 U.S. 1, 9, 101 S.Ct. 2615, 2621, 69 L.Ed.2d 435 (1981). At one time the Court required that a four factor analysis be used in "implying" a cause of action from the violation of a statute. *Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975). Recent cases, however, have indicated that these factors are at best guides to the ultimate question of "whether Congress intended to create the private remedy asserted." *Transamerica Mortgage Advisors, supra,* 444 U.S. at 15–16, 100 S.Ct. at 245; *Touche Ross & Co. v. Redington, supra,* 442 U.S. at 568, 99 S.Ct. at 2485. This congressional intent is to be gleaned from the language and structure, the legislative history, and the circum-

stances surrounding the enactment of the statute at issue.

■ Applying this statutory test to the Personal Attack Rule we hold that no private cause of action can be implied. We start first with the language of the Communications Act of 1934, as amended, 47 U.S.C. § 151 *et seq.* There is no explicit grant of a private cause of action in the Act. The administrative enforcement and penalty provisions of Sections 501–10, however, warn against the implication of such a cause of action since "it is an elemental cannon of statutory construction that where a statute expressly provides a particular remedy or remedies, a court must be chary of reading others into it." *Transamerica Mortgage Advisers v. Lewis, supra,* 444 U.S. at 19, 100 S.Ct. at 247. *See National Railroad Passenger Corp. v. National Association of Railroad Passengers,* 414 U.S. 453, 458, 94 S.Ct. 690, 693, 38 L.Ed.2d 646 (1974). Where elaborate administrative enforcement is provided by the statute it is deemed unlikely that "Congress absentmindedly forgot to mention an intended private action." *Cannon v. University of Chicago,* 441 U.S. at 742, 99 S.Ct. at 1981 (Powell, J., dissenting). The enforcement of the statute thus is vested in the FCC. *See Schnapper v. Foley,* 667 F.2d 102, 116 (D.C.Cir. 1981), *cert. denied,* —— U.S. ——, 102 S.Ct. 1448, 71 L.Ed.2d 661 (1982) (no private right of action under Public Broadcasting and Communications Acts because the courts "may not determine the disposition of controversies that Congress has committed to the discretion of the F.C.C."); *see also, Belluso v. Turner Communications Corp.,* 633 F.2d 393, 397 (5th Cir. 1980) (no private right of action may be implied under the fairness doctrine, 47 U.S.C. § 315(a)); *Daly v. Columbia Broadcasting System, Inc.,* 309 F.2d 83, 86 (7th Cir. 1962) (no private cause of action under § 315(a) of the Act providing for equal time for political candidates); *Ahmad v. Levi,* 414 F.Supp. 597, 603 (E.D.Pa.1976) (no private right of action under § 315(a) providing for equal time for conflicting opinions because the F.C.C. is the exclusive primary

forum in which alleged violations of the Act may be vindicated); *Post v. Payton*, 323 F.Supp. 799, 802 (E.D.N.Y.1971) (no private right of action under § 312 of the Act because the Act did not confer any private rights); *Ackerman v. Columbia Broadcasting System, Inc.*, 301 F.Supp. 628, 631 (S.D. N.Y.1969) (no private right of action under § 315(a) because no new rights created and no authorization for suit in federal courts); *Gordon v. National Broadcasting Co.*, 287 F.Supp. 452, 455–56 (S.D.N.Y.1968) (F.C.C. is exclusive forum for remedy).

This statutory construction "could yield, of course, to persuasive evidence of a contrary legislative intent." 444 U.S. at 20, 100 S.Ct. at 247. *See Securities Investor Protection Corp. v. Barbour*, 421 U.S. 412, 419, 95 S.Ct. 1733, 1738, 44 L.Ed.2d 263 (1975). The requirement of "persuasive" contrary evidence makes the examination of legislative history a futile exercise, however, since the legislative history will almost invariably also be silent when, as here, a statute does not expressly deal with the existence of a private cause of action. The private litigants rarely can show an affirmative pronouncement in the legislative history that private actions were intended. The legislative history of the Communications Act is silent, as silent as most others.

The circumstances surrounding its enactment indicate that the purpose of the Act "was to protect the public interest in communications," *Scripps-Howard Radio, Inc. v. FCC*, 316 U.S. 4, 14, 62 S.Ct. 875, 882, 86 L.Ed. 1229 (1942). The FCC was created to deal with the chaos that preceded the Radio Act of 1927, and to establish "a unified and comprehensive regulatory system for the [telecommunications] industry." *FCC v. Pottsville Broadcasting Co.*, 309 U.S. 134, 137, 60 S.Ct. 437, 438, 84 L.Ed. 656 (1940). The focus of the Act is the general public, with the FCC, not the private litigant, as its champion. Lechtner asserts that the Personal Attack Rule is intended to protect him as a victim of a negative broadcast by a licensee. We empathize with his position but feel constrained by the Supreme Court's pronouncements on the implication of private causes of action from statutes. The

Court has indicated that "the mere fact that [a] statute was designed to protect [certain groups] does not require the implication of a private cause of action for damages on their behalf." *Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 24, 100 S.Ct. 242, 249, 62 L.Ed.2d 146 (1979); *see Touche Ross & Co. v. Redington, supra.* The focal question of congressional intent to create a private cause of action is thus undisturbed by the existence of private beneficiaries. Moreover, the provision conferring a benefit in our case is an administrative regulation. The impact of the enabling statute itself is regulatory and not remedial. The fact, therefore, that some regulations benefit well defined groups is an even weaker argument for implying a private cause of action than the one rejected in *Transamerica*.

### III.

We have concluded that the Personal Attack Rule does not provide a private right of action to plaintiff here. Since the Rule was plaintiff's sole source of federal jurisdiction, we must now decide whether to vacate the jury verdict in its entirety and remand this case for dismissal, or to vacate only the award of damages for violation of the Personal Attack Rule and allow the remainder of the verdict to stand.

In *Tully v. Mott Supermarkets, Inc.*, 540 F.2d 187 (3d Cir. 1976), this court dealt with a question similar to that presented here. In that case, the trial court entered judgment for plaintiffs on a federal securities claim (under Rule 10b–5) and on various pendent state law claims. This court ruled that the plaintiffs did not have standing to sue under 10b–5, and ordered that the judgment on the 10b–5 claims be reversed and the 10b–5 claims dismissed.

This court then turned to the pendent state claims, and stated:

The substantiality of the federal claim is ordinarily determined on the basis of the pleadings. If it appears that the federal claim is subject to dismissal under F.R. Civ.P. 12(b)(6) or could be disposed of on a motion for summary judgment under F.R.Civ.P. 56, then the court should ordi-

narily refrain from exercising jurisdiction in the absence of extraordinary circumstances....

Applying these principles to the instant case, we believe that the pendent state claims should have been dismissed together with the federal claims. Plaintiffs' lack of standing to sue under Rule 10b–5 was a threshold bar which precluded them from stating in their complaint a cognizable claim for relief under the federal securities laws. As a consequence, their complaint could not have withstood a motion to dismiss....

*Id.* at 196.

*Tully* requires that this case be vacated and remanded for dismissal in its entirety. The court may, on remand, consider whether that order should provide for transfer of the state law claims to a Pennsylvania court. *See* 42 Pa.Cons.Stat.Ann. §§ 5103(a) and (b) (Purdon 1981).