**NEW ENGLAND TELEPHONE AND TELEGRAPH COMPANY, Plaintiff,**

v.

**PUBLIC UTILITIES COMMISSION OF MAINE, Peter A. Bradford, Cheryl Harrington, and Ralph H. Gelder, Defendants.**

Civ. No. 83–0166–P.

United States District Court,
D. Maine.

June 15, 1983.

Ralph I. Lancaster, Jr., Everett P. Ingalls, Portland, Me., for plaintiff.

Joseph G. Donahue, Charles F. Dingman, William E. Furber, Maine Public Utilities Com'n, Augusta, Me., for defendants.

## ORDER DENYING MOTION FOR TEMPORARY RESTRAINING ORDER

CYR, District Judge.

### I. INTRODUCTION

In this action brought under section 401(b) of the Federal Communications Act of 1934, as amended [Communications Act], 47 U.S.C. § 401(b), New England Telephone [NET] seeks injunctive relief requiring the Maine Public Utilities Commission [PUC] to adopt, for the purpose of setting NET's intrastate revenues, the depreciation calculations prescribed by the Federal Communications Commission [FCC]. The motion for a temporary restraining order [TRO] has been briefed and argued.

### II. FACTS

On December 14, 1982 the FCC released an order prescribing the use of certain accounting practices in calculating NET's revenues [Prescription Order]. In paragraph 26 of the Prescription Order, the FCC expressly reserved the question as to whether state utility commissions would be bound to apply the prescribed accounting practices, noting that the question "is before us in a separate proceeding."

Neither the PUC nor NET was a party to that "separate proceeding", which involved (1) a petition filed by American Telephone and Telegraph Company for reconsideration of a prior FCC order declaring that FCC depreciation prescriptions do not have preemptive effect, and (2) a petition for declaratory relief filed by General Telephone Company of Ohio seeking a declaration that the Ohio Public Utilities Commission was preempted from applying depreciation rates different from those prescribed by the FCC. In its decision [Preemption Order], released on January 6, 1983, the FCC granted both petitions, holding that "inconsistent state prescribed depreciation rates are preempted by [sections 220(a) & (b) of] the ... Act."

[Preemption Order at ¶ 43]. The FCC ordered that the Preemption Order be published in the Federal Register [¶ 48] and that copies be served on each state commission [¶ 49].

Despite having received a copy of the Preemption Order, the PUC, on April 26, 1983, issued an order [PUC Order] setting NET's intrastate revenues by using depreciation calculations different from those prescribed in the Prescription Order.

All other things being equal the application of the accounting conventions prescribed by the FCC would increase NET's intrastate revenues for the current year by $1,667,000.

## III. DISCUSSION

### A. *Johnson Act*

▮▮▮ The PUC contends that the Johnson Act, 28 U.S.C. § 1342; prevents this Court from enjoining the PUC.[1] Since the Court's jurisdiction is based upon section 401(b) of the Communications Act and not solely upon diversity of citizenship or on repugnance of the PUC order to the Federal Constitution, the Johnson Act does not apply. The PUC incorrectly contends that because only the Supremacy Clause, U.S. Const. art. VI, renders state law subordinate to federal law, this Court's jurisdiction is, for purposes of the Johnson Act, based solely on the repugnance of the PUC order to the Federal Constitution. Not only would the PUC's interpretation of the Johnson Act render the Act's first requirement a virtual nullity,[2] such an interpretation also

---

1. The Johnson Act provides as follows:
 The district courts shall not enjoin, suspend or restrain the operation of, or compliance with, any order affecting rates chargeable by a public utility and made by a State administrative agency or a rate-making body of a State political subdivision, where:
 (1) Jurisdiction is based solely on diversity of citizenship or repugnance of the order to the Federal Constitution; and,
 (2) The order does not interfere with interstate commerce; and,
 (3) The order has been made after reasonable notice and hearing; and,
 (4) A plain, speedy and efficient remedy may be had in the courts of such State.

tortures the plain meaning of the language of that provision. The use of the word "solely" indicates *at least* that where, as here, jurisdiction over a claim is based *principally* upon an Act of Congress the Johnson Act does not apply. The circumstances surrounding its enactment indicate that

> [t]he Act, adopted in 1934, was designed to further the same policies reflected in the three-judge court requirement which had been enacted in 1910. *Alabama Public Service Commission v. Southern Railway,* 341 U.S. 341, 357, 358, 71 S.Ct. 762, 772, 95 L.Ed. 1002 (1951) (Frankfurter, J., concurring). Hence, the Supreme Court's analysis of the legislative purpose of the three-judge court provision is relevant to our construction of the Johnson Act:
> > Their [the Congress'] ire was aroused by the frequent grants of injunctions against the enforcement of progressive state regulatory legislation, usually on substantive due process grounds.... In contrast, a case involving an alleged incompatibility between state and federal statutes ... involves more confining legal analysis and can hardly be thought to raise the worrisome possibilities that economic or political predilections will find their way into a judgment.

*International Brotherhood of Electrical Workers v. Public Service Commission,* 614 F.2d 206, 211 (9th Cir.1980) [*quoting Swift & Co. v. Wickham,* 382 U.S. 111, 127, 86 S.Ct. 258, 267, 15 L.Ed.2d 194 (1965)]. In *International Brotherhood of Electrical Workers,* the Court held that jurisdiction

---

2. Since by its terms the Johnson Act only applies to actions to enjoin the orders of state agencies, jurisdiction over every action asserting that an order violates a federal statute would, under the PUC's theory, be based solely on repugnancy to the Constitution. Indeed, the PUC cites Wright and Miller for the proposition that "[i]t is difficult to see what significance [the Act's first paragraph] is expected to have and it is always found to be satisfied," 17 C. Wright, A. Miller, E. Cooper & E. Gressman, *Federal Practice & Procedure,* § 4236 at 411 (1978).

over a claim that Congress by "occupying the field" had preempted state regulation was not based "solely on repugnancy to the Constitution." The argument for finding that the first test of the Johnson Act has not been satisfied is even stronger where, as in this case, the plaintiff claims that the prohibition against state action is explicit. *See id.* at 210.

Finally, it is simply inaccurate to say that the first test "is always found to be satisfied." Several cases, in addition to *International Brotherhood of Electrical Workers,* have held that the first test is not met where a state agency's order is challenged as violative of federal statutory law. *See, e.g., Munoz v. Porto Rico Ry. Light & Power Co.,* 83 F.2d 262, 267 (1st Cir.), *cert. denied,* 298 U.S. 689, 56 S.Ct. 955, 80 L.Ed. 1408 (1936); *Beckenstein v. Hartford Electric Light Co.,* 479 F.Supp. 417, 420 n. 1 (D.Conn.1979); *Cabot Corp. v. Public Service Commission,* 332 F.Supp. 370 (S.D.W. Va.1971).

### B. *The Motion for a TRO*

In the First Circuit, a plaintiff must satisfy four criteria in order to be entitled to a preliminary injunction. The Court must find: (1) that plaintiff will suffer irreparable injury if the injunction is not granted; (2) that such injury outweighs any harm which granting injunctive relief would inflict on the defendant; (3) that plaintiff has exhibited a likelihood of success on the merits; and (4) that the public interest will not be adversely affected by the granting of the injunction.

*Planned Parenthood League of Mass. v. Bellotti,* 641 F.2d 1006, 1009 (1st Cir.1981); [3]

*Women's Community Health Ctr., Inc. v. Cohen,* 477 F.Supp. 542, 544 (D.Me.1979).

#### 1. *Irreparable Harm.*

 Depreciation being an expense, whatever depreciation accrues in a given year is generally recoverable in that year from ratepayers. Accordingly, the PUC's refusal to adopt the higher depreciation rules prescribed by the FCC will reduce NET's weekly revenues during the current year by $32,058. In its Complaint [¶ 10(a)], NET contends that since utilities are generally not allowed to increase rates in order to recoup past losses, *see Federal Power Commission v. Natural Gas Pipeline Co.,* 315 U.S. 575, 590, 62 S.Ct. 736, 745, 86 L.Ed. 1037 (1942), the loss of income constitutes irreparable injury. But it is uncontroverted that all of NET's capital investment will eventually be returned either in depreciation or amortization and that, in the meantime, because of the corresponding increase in its rate base NET will earn a "fair rate of return." It is well established that a mere delay (during which interest is earned) in receiving money is not considered irreparable injury, *see* 11 C. Wright & A. Miller, *Federal Practice and Procedure,* § 2948 at 434 (1973).

At oral argument and in its post-argument memorandum NET contended that the delay itself would cause irreparable injury. NET relies on the FCC's finding in the Preemption Order that delayed capital recovery "could delay or prevent modernization which would add to the costs borne by ratepayers and could, ultimately, threaten carriers' ability to fully recover their invested capital." [Preemption Order ¶ 37].[4] But this finding relates only to the perceived *potential* adverse effects of prolonged underdepreciation. None of the

---

**3.** Although *Bellotti* involved a preliminary injunction, NET correctly contends that the factors enumerated in *Bellotti* should be applied in considering a motion for a TRO. This approach is consistent with the realization that the distinction between TRO's and preliminary injunctions is at best unclear, *see San Francisco Real Estate v. Real Estate Investment Trust of America,* 692 F.2d 814 (1st Cir.1982).

**4.** Similarly, at paragraph 37 of the Preemption Order the FCC stated:

The extent of state action attempting to prevent carriers from utilizing our depreciation prescriptions places substantial burdens on carriers and could well impair their ability to raise the investment capital they will need to fully compete in the continually evolving competitive telecommunications marketplace.

FCC's findings address the significance of a delay in recovering the relatively small amount of additional revenue NET would receive as the result of a TRO. Indeed, none of the FCC's findings pertain to NET directly. And the record is devoid of evidence that this underdepreciation, which apparently has been going on for some time, has threatened NET's "ability to fully recover its invested capital." NET has presented no evidence and indeed has made no allegation that it is, or absent a TRO may become, undercapitalized or unable to obtain capital funds.

Accordingly, the Court finds that NET has failed to meet its burden of proving irreparable injury.

### 2. *The Relative Harm.*

Since NET has not shown that it will suffer irreparable injury absent a TRO, it has also failed to satisfy the second *Bellotti* criterion.

### 3. *Likelihood of Success on Merits.*

Although the complaint asserts three independent theories in support of NET's request for injunctive relief, at oral argument and in its memoranda in support of its motion for a TRO NET has pressed and the Court will consider only the theory that the Preemption Order is enforceable against the PUC under section 401(b) of the Communications Act.[5] Section 401(b) provides as follows:

5. The other theories asserted in the Complaint are that the PUC order violates (1) section 220(b) of the Communications Act, 47 U.S.C. § 220(b), which according to NET and the FCC preempts state regulation, and (2) the Commerce Clause, U.S. Const. art. I, § 8, cl. 3.

6. See, for example, the following passages from the Preemption Order:
Accordingly, we find that the statutory language indicates that FCC depreciation prescriptions are to be followed in both the federal and state jurisdictions unless the FCC provides otherwise. As demonstrated below, this construction is also consistent with the legislative history.
Preemption Order ¶ 17.
[W]e find it imperative to declare today that inconsistent state prescribed depreciation

(b) If any person fails or neglects to obey any order of the Commission other than for the payment of money, while the same is in effect, the Commission or any party injured thereby, or the United States, by its Attorney General, may apply to the appropriate district court of the United States for the enforcement of such order. If, after hearing, that court determines that the order was regularly made and duly served, and that the person is in disobedience of the same, the court shall enforce obedience of such order by a writ of injunction or other proper process, mandatory or otherwise, to restrain such person or the officers, agents, or representatives of such person, from further disobedience of such order, or to enjoin upon it or them obedience to the same.

The order is a clear declaration of the FCC's position that federal law preempts all state depreciation rates which are inconsistent with the rules prescribed by the FCC.[6] Since it is undisputed that the depreciation rates adopted by the PUC Order are inconsistent with those prescribed in the Prescription Order, the critical issue is whether the PUC's refusal to comply with the holding of the Preemption Order constitutes "disobedience of [an order]", within the meaning of section 401(b).[7]

Relying on *Columbia Broadcasting System, Inc. v. United States,* 316 U.S. 407, 62 S.Ct. 1194, 86 L.Ed. 1563 (1942), NET

rates are preempted by the Communications Act and are accordingly void.
*Id.* at ¶ 43.
We must find that inconsistent depreciation rates prescribed by state commissions will interfere with the efficient operation of the communications marketplace and thereby frustrate the achievement of the Commission's policies. Accordingly, we find that this Commission's depreciation policies and rates, including the expensing of inside wiring, preempt inconsistent state depreciation policies and rates.
*Id.* at ¶ 45.

7. It is unclear whether the PUC is a "person" within the meaning of section 401(b). *See* 47 U.S.C. § 153(i) [defining "person"].

incorrectly contends that all FCC pronouncements, including rules, regulations and adjudicatory orders, are enforceable as "orders" under section 401(b).[8] In *Columbia Broadcasting System,* the Court held that an FCC order promulgating certain regulations (and the substance of the regulations) was a reviewable "order" under section 402 of the Communications Act, 47 U.S.C. § 402. *See also City of Peoria v. General Electric Cablevision Corp.,* 690 F.2d 116, 119 (7th Cir.1982). Although the proper interpretation of a word as used in one provision of an act may indeed aid in interpreting the word as used in another provision of the same act, such rules of interpretation must never divert courts from their responsibility to interpret words in light of the "objects and policy of the law." *Bob Jones University v. United States,* —— U.S. ——, ——, 103 S.Ct. 2017, 2024–25, 76 L.Ed.2d 157 (1983). In *Columbia Broadcasting System,* C.B.S. alleged that its affiliates had cancelled contracts with C.B.S. in order to comply with FCC regulations. Because the regulations, if unlawful, were irreparably injuring the appellant, it was inconceivable that Congress had intended to shelter them from judicial review.

> It is the signing of the contract which, by virtue of the regulations alone, has legal consequences to the stations and to appellant. The regulations are not any less reviewable because their promulgation did not operate on their own force to deny or cancel a license. It is enough that failure to comply with them penalizes licensees and appellant, with whom they contract.

*Columbia Broadcasting System, Inc. v. United States,* 316 U.S. at 417, 62 S.Ct. at 1200. Thus it is clear that the Court was not relying on a technical interpretation of the word "order".

> The ultimate test of reviewability is not to be found in an overrefined technique, but in the need of the review to protect from the irreparable injury threatened in the exceptional case by administrative rulings which attach legal consequences to action taken in advance of other hearings and adjudications that may follow, the results of which the regulations purport to control.

*Id.* at 425, 62 S.Ct. at 1204.

■ The present action is brought by a private party under section 401, *for enforcement,* not under section 402 for review, of the Preemption Order. It is well established that "[t]he Communications Act ... did not create new private rights." *Scripps-Howard Radio, Inc. v. Federal Communications Commission,* 316 U.S. 4, 14, 62 S.Ct. 875, 882, 86 L.Ed. 1229 (1942). Rather, "[t]he focus of the Communications Act is the general public, with the FCC, not the private litigant, as its champion." *Lechtner v. Brownyard,* 679 F.2d 322, 327 (3d Cir. 1982). In order to insure that the FCC, through its discretion and expertise, will be able to foster beneficial and proper interpretations and applications of the Communications Act, *see Federal Communications Commission v. Pottsville Broadcasting Co.,* 309 U.S. 134, 139, 60 S.Ct. 437, 440, 84 L.Ed. 656 (1940); *Massachusetts Universalist Convention v. Hildreth & Rogers Co.,* 183 F.2d 497 (1st Cir.1950), the Act is generally viewed as not having created implied private rights of action, either for damages,[9]

---

8. NET has not clarified its position as to the proper interpretation of section 401(b). At oral argument NET counsel argued that for purposes of applying section 401(b) there is no distinction between orders, rules and regulations. Indeed, NET counsel argued that the Preemption Order resulted from a rule-making, as opposed to an adjudicatory, proceeding. However, in its post-hearing memorandum, NET contends that the Court need not decide whether rules or regulations are enforceable under section 401 because the Preemption Order is "significantly different" from an FCC rule [NET Memorandum at 15].

9. Sections 206 and 207 of the Communications Act, 47 U.S.C. § 206 & 207, expressly authorize certain private enforcement actions against common carriers. Section 206 provides as follows:

> In case any common carrier shall do, or cause or permit to be done, any act, matter, or thing in this Act prohibited or declared to be unlawful, or shall omit to do any act, matter, or thing in this Act required to be done, such common carrier shall be liable to the person or persons injured thereby for the full amount of damages sustained in conse-

e.g., *Lechtner v. Brownyard, supra;* *Schnapper v. Foley,* 667 F.2d 102 (D.C.Cir. 1981), *cert. denied,* 455 U.S. 948, 102 S.Ct. 1448, 71 L.Ed.2d 661 (1982); *Belluso v. Turner Communications Corp.,* 633 F.2d 393 (5th Cir.1980), or for injunctive relief, *see Schnapper v. Foley, supra; Comtronics, Inc. v. Puerto Rico Telephone Co.,* 409 F.Supp. 800 (D.P.R.1975); *aff'd on other grounds,* 553 F.2d 701 (1st Cir.1977).

■ Section 401 reflects the congressional mandate given the FCC; it does not empower private enforcement. Under section 401(a) the Attorney General may seek a writ of mandamus to compel compliance with the provisions of the Communications Act. But the Attorney General has no discretion; he may bring an action if, and only if, 47 U.S.C. § 401(a), the FCC requests. In sharp contrast to the provisions of subsections (a) and (c), section 401(b) provides that the FCC, the United States (without FCC authorization) or any injured party may bring an action in district court for the enforcement of an FCC order. It appears that Congress intended that, in order to promote the enforcement role of the FCC, section 401(b) would be given narrow scope.

■ Although the provisions of section 401 do not specify whether regulations are to be enforced under subsection (a) or (b), it is clear from section 4(i) of the Communications Act, 47 U.S.C. § 154(i), that Congress understood orders to be distinct from rules and regulations. The importance of the FCC's enforcement role would be seriously impinged if regulations, which are often general and which frequently either interpret or merely parrot legislation, were to be considered enforceable as orders under subsection 401(b).[10] Thus, in order to preserve the prerogative of the FCC, even specific FCC regulations, and the Communications Act itself, do not give rise to implied private rights of action, *see Lechtner v. Brownyard, supra.*[11]

■ NET next contends that, assuming that not all FCC pronouncements are enforceable under section 401(a), the Preemption Order should nevertheless be considered an order which is enforceable against all state commissions under section 401(b). NET points to the fact that the Preemption Order is called an order. But the "label placed upon the [Preemption Order] by the [FCC] is not necessarily conclusive, for it is the substance of what the [FCC] has purported to do and has done which is decisive." *Columbia Broadcasting System, Inc. v. United States,* 316 U.S. at

quence of any such violation of the provision of this Act, together with a reasonable counsel or attorney's fee, to be fixed by the court in every case of recovery, which attorney's fee shall be taxed and collected as part of the costs in the case.

Section 207 provides as follows:
Any person claiming to be damaged by any common carrier subject to the provisions of this Act may either make complaint to the Commission as hereinafter provided for, or may bring suit for the recovery of the damages for which such common carrier may be liable under the provisions of this Act, in any district court of the United States of competent jurisdiction; but such person shall not have the right to pursue both such remedies.

10. For example, in *Schnapper v. Foley,* 667 F.2d 102 (D.C.Cir.1981), *cert. denied,* 455 U.S. 948, 102 S.Ct. 1448, 71 L.Ed.2d 661 (1982), the Court held that section 309(a) of the Communications Act, 47 U.S.C. § 309(a), which requires the FCC to grant broadcast licenses if doing so would serve the public interest, convenience and necessity, does not give rise to private rights of action for injunctive relief because

Congress committed the controversy to the discretion of the FCC. The Court did not consider whether 47 C.F.R. § 21.32(a), which reiterates section 309(a), gives rise to a private right of action.

11. In *Lorentz v. Westinghouse Electric Corp.,* 472 F.Supp. 946 (W.D.Pa.1979), the court held that the FCC's personal attack rule, 47 C.F.R. § 73.123, may be enforced through private actions in district courts. But since the decision was based on the conclusion that the personal attack rule was promulgated to provide a private remedy for the protection of a particular class, *Lorentz* does not support a rule that FCC regulations generally give rise to private rights of action. Indeed, the *Lorentz* court did not attempt to distinguish actions to enforce regulations from actions to enforce the Act itself. Furthermore, the Third Circuit, in which the Western District of Pennsylvania lies, has held that the personal attack rule does not create private rights of action. *Lechtner v. Brownyard,* 679 F.2d 322 (3d Cir.1982).

416, 62 S.Ct. at 1200. NET incorrectly contends that the fact that the FCC ordered "the secretary" to serve a copy of the Preemption Order on each state commission establishes that the FCC intended the Preemption Order to be enforceable under section 401(b) against each state commission. Even assuming that the intent of the FCC would be dispositive, any number of reasons may explain why the order was served on each state commission. Obviously, state commissions would be interested in the views of the FCC on an issue which may affect them directly. The FCC may have intended to warn state commissions of the possibility of enforcement actions under section 401(a) or to provide them with an opportunity to submit briefs as *amicus curiae* in the event of an appeal from the Preemption Order. In any case, it is clear that the FCC does not serve copies of its orders upon only those it intends to subject to enforcement actions under section 401(b). The Preemption Order reversed the FCC's earlier order in *Amendment of Part 31,* 89 FCC2d 1094 (1982), copies of which were also "served on" each state commission. Obviously, the FCC did not intend to create a right of action to enforce against state commissions the FCC's determination that the state commissions were *not required* to apply FCC prescribed depreciation calculations. Finally, the FCC could have placed beyond doubt its alleged intention to subject each state commission to enforcement actions under section 401(b), simply by ordering all state commissions to adopt the depreciation formula prescribed by the FCC.

Finally, NET mistakenly contends that under the definitions of the Administrative Procedure Act [APA], 5 U.S.C. §§ 551–559, 701–706, the Preemption Order is an order enforceable against the PUC. The definitional section of the APA, 5 U.S.C. § 551, makes clear that the categories of "rules" and "orders" are mutually exclusive.[12] The distinction drawn by these definitions is between the promulgation of policy-type rules or standards binding upon the affected public generally, on the one hand, and the resolution of, and application of legal principles to, disputed factual matters, on the other. *See United States v. Florida East Coast Ry. Co.,* 410 U.S. 224, 245, 93 S.Ct. 810, 821, 35 L.Ed.2d 223 (1973); *Precious Metals Associates, Inc. v. Commodity Futures Trading Comm.,* 620 F.2d 900, 911 (1st Cir.1980); *PBW Stock Exchange, Inc. v. Securities and Exchange Commission,* 485 F.2d 718, 732 (3d Cir.1973).

The definitions contained in the APA, enacted in 1946, cannot simply be grafted onto the Communications Act of 1934. *See National Petroleum Refiners Ass'n v. Federal Trade Commission,* 340 F.Supp. 1343 (D.D.C.1972), *rev'd on other grounds,* 482 F.2d 672 (D.C.Cir.1973), *cert. denied,* 415 U.S. 951, 94 S.Ct. 1475, 39 L.Ed.2d 567 (1974). But the distinction drawn in the APA between orders and rules is helpful in interpreting the Communications Act. As already noted, the Communications Act contemplates a distinction between orders and rules. And the distinction drawn in the APA is consistent with the case law antedating the enactment of the Communications Act. *See Bi-Metallic Investment Co. v. State Board of Equalization,* 239 U.S. 441, 36 S.Ct. 141, 60 L.Ed. 372 (1915). Indeed, the *Columbia Broadcasting System* Court, speaking four years prior to the enactment of the APA, described the distinction between rules and adjudicatory orders as follows:

> Unlike an administrative order or a court judgment adjudicating the rights of individuals, which is binding only upon parties to the particular proceeding, a valid exercise of the rule-making power is addressed to and sets a standard of conduct for all to whom its terms apply. It operates as such in advance of the imposition of sanctions upon any particular individual.

316 U.S. at 418, 62 S.Ct. at 1201.

The very use of the words "obey" and "disobedience", as opposed to "comply"

---

12. As used in the APA, " 'order' means the whole or a part of a final disposition, whether affirmative, negative, injunctive, or declaratory in form, of an agency in a matter *other than rule making* but including licensing;" 5 U.S.C. §§ 551(6) & 701(b)(2) [*emphasis added*].

and "violation", in section 401(b), indicates that the word "order" was intended to refer to the type of self-executing directive referred to in *Columbia Broadcasting System.* And the jurisprudence under section 401(b) also supports the view that the section was intended to provide a forum only for the enforcement of directives which generally would be addressed to a party to an adjudicatory proceeding. In *Comtronics, Inc. v. Puerto Rico Telephone Co., supra,* the plaintiff sought injunctive relief, alleging, *inter alia,* that the defendant had violated the FCC's "holdings, rulings and policies...." In dismissing the action for lack of jurisdiction the court noted that "[o]nly under section 402(b) (sic) could a subscriber apply to this Court, and then only to obtain enforcement of an *order* of the FCC." *Comtronics, Inc. v. Puerto Rico Telephone Co.,* 409 F.Supp. at 817 [*emphasis in original*]. In *Kroeger v. Stahl,* 148 F.Supp. 403 (D.N.J. 1957), plaintiff sought injunctive relief against the enforcement of a zoning ordinance which prevented him from conducting certain tests which the FCC had authorized. The court held that the FCC's authorization was not an order within the meaning of section 401(b) because, *inter alia,* "[i]t did not direct plaintiff or anyone else to do anything." *Id.* at 408. On the other hand, when section 401(b) has been successfully invoked it has generally been to enforce compliance with a specific order directed at a specific person. *See Federal Communications Commission v. Cohn,* 154 F.Supp. 899, 911 (S.D.N.Y.1957); *United States v. National Plastikwear Fashions,* 123 F.Supp. 791, 792 (S.D.N.Y.1954).

The cases interpreting a now repealed provision of the Interstate Commerce Act, 49 U.S.C. § 16(12), which was apparently the legislative progenitor of section 401(b),[13]

further support the conclusion that the word "order" as used in section 401(b) was intended to mean "directive". For example, in *McFaddin Express, Inc. v. Adley Corp.,* 346 F.2d 424, 426 (2d Cir.1965), *cert. denied,* 382 U.S. 1026, 86 S.Ct. 643, 15 L.Ed.2d 539 (1966), the ICC "ordered" that an application to permit a management takeover be granted, and "authorized" the management takeover upon the terms of a contract which the parties had executed and filed with the ICC. The Second Circuit held that a violation of the terms of that contract did not constitute disobedience of an "express command of the ICC" and therefore did not give rise to an action under section 16(12). And in *Farmers' Loan & Trust Co. v. Northern Pac. Ry. Co.,* 83 F. 249 (D.Wash.1897), the Court held that "a mere general declaration of the duty of the defendant corporations, as defined in the law itself" was not a "definite order of the [ICC] which can be enforced by a decree of this court" under section 16(12). *See also Interstate Commerce Commission v. Western N.Y. & P.R. Co.,* 82 F. 192 (W.D.Pa.1897) [finding an ICC order enforceable against a corporation which was not a defendant before the ICC only because the corporation was the successor of the defendant against which the order was entered].

As the Supreme Court has observed in its discussion of section 16(12), "[i]n common acceptance a suit to enforce an order of the Commission is one which seeks to compel *the carrier to whom the order is directed* to yield obedience to its *command.*" *Illinois Central R.R. Co. v. State Public Utilities Commission,* 245 U.S. 493, 502, 38 S.Ct. 170, 173, 62 L.Ed. 425 (1918). Plaintiff has cited and the Court has found no reported decision in which compliance with a declaration

---

**13.** After its amendment in 1910, 36 Stat. 555, and at the time the Communications Act was enacted, section 16(12) provided as follows:

If any carrier fails or neglects to obey any order of the commission other than for the payment of money, while the same is in effect, the Interstate Commerce Commission or any party injured thereby, or the United States, by its Attorney-General, may apply to the commerce court for the enforcement of

such order. If, after hearing, that court determines that the order was regularly made and duly served, and that the carrier is in disobedience of the same, the court shall enforce obedience to such order by a writ of injunction or other proper process, mandatory or otherwise, to restrain such carrier, its officers, agents, or representatives, from further disobedience of such order, or to enjoin upon it or them obedience to the same.

was enjoined under either section 401(b) or former section 16(12) of Title 49.[14]

 The Court need not consider whether declaratory orders [15] are enforceable under section 401(b) against named parties. But the Court is satisfied that a nonparty who violates the holding of a declaratory order issued by the FCC is not thereby "in disobedience of an order" within the meaning of section 401(b). Therefore, NET has failed to demonstrate a likelihood that it will succeed on the merits of its action under section 401(b).

NET having failed to satisfy three of the criteria [16] set out in *Bellotti,* it is ORDERED that NET's motion for a TRO be DENIED.[17]

SO ORDERED.

---

14. NET has provided the Court with copies of several recent orders in which other district courts have enjoined violations of the Preemption Order under section 401(b). In none of those orders were the requirements of section 401(b) discussed.

15. The APA clearly contemplates the issuance of declaratory orders. 5 U.S.C. § 554(e). But since they are only as effective as other adjudicatory orders, *id.,* they are not binding upon

nonparties. *See Columbia Broadcasting System, Inc. v. United States,* 316 U.S. 407, 418, 62 S.Ct. 1194, 1200, 86 L.Ed.2d 1563 (1942).

16. The Court is satisfied that the public interest would not be adversely affected by granting the TRO.

17. Accordingly, the Court need not address the various other issues raised by the parties.