**UNITED LIQUORS, INC.,**
**Plaintiff, Appellee,**

v.

**CARILLON IMPORTERS, LTD.,**
**Defendant, Appellant.**

No. 89-1541.

United States Court of Appeals,
First Circuit.

Heard Sept. 7, 1989.

Decided Dec. 21, 1989.

Gerald J. Caruso, with whom Ferriter, Scobbo, Sikora, Caruso & Rodophele, P.C., Boston, Mass., Louis Ederer and Buchman,

O'Brien & Williams, New York City were on brief, for defendant, appellant.

James L. Quarles III, with whom William G. McElwain and Hale and Dorr, Boston, Mass., were on brief, for plaintiff, appellee.

Before BOWNES, Circuit Judge, and ALDRICH and FLOYD R. GIBSON,* Senior Circuit Judges.

BAILEY ALDRICH, Senior Circuit Judge.

The usual case of exclusive distributorship involves an across-the-board line of products. *See, e.g., Solman Distributors, Inc. v. Brown Forman Corp.,* 888 F.2d 170 (1st Cir.1989). A more complex question may arise when the exclusivity relates only to individual items, and in the liquor industry both questions may exist against a statutory backdrop affecting discontinuances. *Id.* The present appeal is from the granting of a preliminary injunction against a cessation of individual exclusivity. In our opinion it raises only one of the four tests, *cf. Planned Parenthood League v. Bellotti,* 641 F.2d 1006, 1009 (1st Cir.1981)—the likelihood of ultimate success.

Defendant, Carillon Importers, Ltd., is the exclusive importer of various spirituous liquors, including Absolut vodka and Bombay gin. These two it sold to plaintiff, United Liquors, Ltd., a wholesaler, and to at least one other distributor, Brockton Wholesale Beverage Company. In both instances, the product lines were thereafter enlarged by adding flavorings, resulting in Absolut Citron vodka and Bombay Sapphire gin. For these new products defendant chose plaintiff as its sole distributor. Brockton, claiming that they were but continuations of the brands defendant was presently selling it, and that its exclusion was an illegal discontinuance under the Massachusetts statute,[1] filed an objection

* Of the Eighth Circuit, sitting by designation.

1. Mass.Gen.Laws, c. 138, § 25E provides in part:
   It shall be an unfair trade practice and therefor unlawful for any manufacturer, winegrower, farmer-brewer, importer or wholesaler of any alcoholic beverages, *to refuse to* sell, except for good cause shown, any item

having a brand name to any licensed wholesaler to whom such manufacturer, winegrower, farmer-brewer, importer or wholesaler has made regular sales of such brand item during a period of six months preceding any refusal to sell....

with the Alcoholic Beverage Control Commission. Although the ABCC ruled in defendant's favor, defendant was nonetheless apprehensive of a lawsuit by Brockton, and terminated plaintiff's exclusivity with respect to Absolut Citron and Bombay Sapphire by adding Brockton as a distributor.

This suit followed, plaintiff claiming this was a breach of a special contract relating to these products. After hearings, based on affidavits, the court agreed, to the extent of entering a preliminary injunction ordering defendant to distribute Absolut Citron and Bombay Sapphire to no one in Massachusetts except plaintiff. Defendant appeals, denying, inter alia, that there was any exclusivity contract, but asserting that if there was one, it was for one year only, and that as the year has passed, there remains no basis for the injunction. If this last point is well-taken, at the time the injunction was entered it was not immediately involved, and, so far as appears, no thought was given it.

The affidavits show no formal contract, but there were memoranda. According to Exhibit A, defendant's representative DiMuro's memorandum of meeting with plaintiff's CEO, Tye, Tye requested, inter alia, "(a) *The exclusive distribution rights* to Laurent–Perrier, Bombay Sapphire, Absolut Citron and Glenmorangia *for at least* (1) *one year* in Massachusetts, *longer if mutually agreed upon targets are met.*" (Emphasis supplied.) In Exhibit B, a memorandum from DiMuro to Dave Roberts, plaintiff's president, DiMuro stated he had sent a copy of Exhibit A to an officer of defendant, who had replied, "Fine—let's go with United." Exhibit B further provided,

Details to iron out in order to finalize all matters:

1. Move out from Martignetti—all Laurent–Perrier, Sapphire, Glenmorangia inventories.

2. Writ P.O.s on all brands discussed.

3. Set up targets for all exclusive brands.

It is common ground that no targets were ever set up. Defendant, however, does not dispute that it constantly commended plaintiff during the first year for its success in selling Absolut Citron and Bombay Sapphire (Laurent–Perrier and Glenmorangia are not sought by plaintiff, or involved in this action.)

The question whether the terms of an agreement have been sufficiently defined can be a difficult one. It has been said that a court will try particularly hard to support a business undertaking. And it may be permissible to go beyond the language if outside circumstances are of assistance. Thus in the leading case of *Cygan v. Megathlin,* 326 Mass. 732, 96 N.E.2d 702 (1951), the court said,

A contract is not to be struck down because one of its material provisions is stated in broad and general terms if, when applied to the transaction and construed in the light of the attending circumstances, the meaning to be attributed to it can be interpreted with reasonable certainty so that the rights and obligations of the parties can be fixed and determined.

326 Mass. at 734, 96 N.E.2d at 703. There defendants agreed to pay plaintiff for his services at the rate of $1 an hour, and "additional compensation" later if defendants "got on their feet." Defendants' business became successful, and plaintiff continued working. The parties not agreeing on what, additionally, was due, plaintiff brought suit. The court indicated that the agreement fairly meant "reasonable compensation," and that reasonable compensation for this type of work was ascertainable. At the same time, it is interesting to observe that even here the court stated it was faced only with payment for services already rendered, and was not deciding whether the contract was sufficiently definite to be enforced as an executory contract for the future.

The present agreement is in two parts; defendant's undertaking to provide Absolut Citron and Bombay Sapphire to plaintiff exclusively, (a) "for at least one year, [and (b) ] longer if mutually agreed upon targets are met." Surely this last could not mean that if plaintiff satisfied defendant as to the first year, its exclusivity could continue on, regardless of its future accomplish-

ments. For the future there must also be targets, either a continuation of the old, or some mutually agreed upon new ones. Plaintiff says the former. We have great difficulties.

We note first, as already stated, that no targets were ever set for the first year. Plaintiff says they were waived because of its success. We accept that. But if what would have been the first year targets are to be the targets for a continuance, plaintiff has a problem of proof. How are they now to be determined? We see no guidance, either as to amounts, or whether they were monthly, quarterly, or only a total for the year. But, beyond that, there is a serious problem of sense. During the first year these were new products. Once launched, very different conditions could be expected in the way of demand, and price, or even in general market conditions. It seems highly unreasonable to think that defendant, who was not the one to seek an agreement in the first place, would be willing to agree in advance that the first year targets would automatically apply to the period thereafter.

The problem does not stop there. How much longer would be "longer"? The very fact that this term (in both senses) is undefined is a further reason for rejecting plaintiff's contention that first year targets should apply to it. It cannot be thought that plaintiff's exclusivity was to continue forever as long as it met first year targets. If only for a "reasonable time," what is the basis for determining reasonableness in this complex area, where individual brands are treated individually? The difficulty is pointed up by the fact that plaintiff's very reason for seeking an agreement was defendant's known antipathy to extended exclusivity.

Nor would plaintiff be aided by construing "mutually agreed upon" as meaning that later targets were to be later negotiated. This construction makes full sense as the intent of the parties, and would be a reasonable business agreement, but, for the same reasons already given, we see nothing, either in the writing, or in the circumstances outside it, that would permit us to determine what should be the proper targets for a further period.

In sum, this case seems as far removed from *Cygan v. Megathlin* as it would seem possible to get. What speaks loudest in the writing are the open words, to be "mutually agreed upon." What speaks loudest apart from the writing is defendant's known antipathy to continued exclusivity of seasoned brands. If plaintiff wished to counter that, believing, it says, that defendant was facile in its business dealings, it was incumbent on it to meet the problem with some definiteness. It did not do so; defendant cannot be forced to negotiate, and there is no contract beyond the first year. The injunction, accordingly, must be terminated. Further proceedings to be consistent with this opinion.